No. 44,026

J. P. Harris, Peter MacDonald, John McCormally, and The Hutchinson Publishing Company, a corporation, *Plaintiffs,* v. John Anderson, Jr., in his official capacity as Governor of Kansas; Paul R. Shanahan, in his official capacity as Secretary of State of the State of Kansas; Viola Pritchard, Commissioner of Elections of Shawnee County, Kansas, and Emogene Wineinger, County Clerk of Greeley County, Kansas, individually as such Election Commissioner and County Clerk of their respective counties, and as representatives of all Election Commissioners and County Clerks of the State of Kansas, *Defendants.*

(412 P. 2d 457)

Opinion filed March 25, 1966.

*William Y. Chalfant,* of Hutchinson, argued the cause, and *H. R. Branine, C. E. Chalfant* and *M. E. Chalfant,* of Hutchinson, were with him on the briefs for plaintiffs.

*Robert C. Londerholm,* Attorney General, of Topeka, argued the cause, and *J. Richard Foth,* Assistant Attorney General, of Topeka, was with him on the briefs for defendants.

The opinion of the court was delivered by

Fatzer, J.: On March 1, 1965, this court held Chapter 2, Laws of 1964, Special Session, apportioning the seats of the House of Representatives to be unconstitutional and void as being in violation of the requirement of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. (*Harris*

*v. Anderson,* 194 Kan. 302, 400 P. 2d 25, cert. den. 382 U. S. 894, 15 L. Ed. 2d 150, 86 S. Ct. 185.) In the opinion it was said:

"For the purpose of affording the legislature ample opportunity to undertake the necessary reapportionment, we withhold further determination of this action, retaining jurisdiction to hear the matter further and to take such additional action as is deemed advisable and within such reasonable time as the circumstances require." (1. c. 312.)

On February 4, 1966, the governor called the legislature into Special Session to enact an apportionment statute "as will comply with constitutional mandate pertaining thereto." The legislature met in Special Session, and on February 28, 1966, enacted House Bill No. 504 which apportioned the state into 125 representative districts. The bill was signed by the governor on March 7, 1966, and was duly published in the official state paper, thus becoming an effective law, if otherwise constitutional.

On March 8, 1966, counsel for the parties filed separate motions requesting this court to judicially review House Bill No. 504 and determine whether it complied with the constitutional requisite announced in *Reynolds v. Sims,* 377 U. S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, that "the equal protection clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." Attached to both motions was a map prepared by the Research Department of the Kansas Legislative Council showing the 125 representative districts created by the Act. On the reverse side was a table showing the 1965 population of the respective representative districts. Also attached to both motions was a memorandum dated February 28, 1966, prepared by the Research Department analyzing the populations of the representative districts so created.

On March 9, 1966, this court ordered that the motions be heard on March 21, 1966, and directed counsel to file written briefs and present oral argument. Upon consideration, the Act was sustained by this court as being in compliance with both the Constitution of the State of Kansas and the Fourteenth Amendment to the Constitution of the United States. Because the public question involved was important and pressing, the court filed an interim opinion on March 22, 1966, so the people and officials of the state would be advised of its decision sustaining the validity of the Act. (*Harris v. Anderson,* 196 Kan. 449, 412 P. 2d 457.)

K. S. A. 4-101 provides that the Kansas House of Representatives shall consist of 125 members, and based upon the 1965 annual state

census population of 2,197,583 people, House Bill No. 504 apportioned the state into 125 districts ranging in population from 15,609 to 19,521. The population of the median district is 17,680, that is, one-half of the districts are above that figure and the other one-half are below. (If there was complete mathematical equality, each district would have a population of 17,583.) Of the 125 districts created, 123 have populations ranging between 16,000 and 19,000. Ninety-seven of the new districts vary no more than 6 percent from the mean average, and all the remaining 28, except two, vary less than 9 percent above or below that average. Both the smallest and largest districts deviate only 11 percent from the mean average, and the ratio of the largest district (No. 9) to the smallest district (No. 89) is 1.25:1. The largest district consists of two rural counties which were kept intact.

The following tabulation shows the distribution of the 125 districts by intervals of five hundred population. It is noted that 97 of the districts have populations between 16,500 and 18,500, which indicates there is a very substantial convergence of district populations around the average of 17,583.

| District Population | Number of Districts |
|---|---|
| 15,500-15,999 | 1 |
| 16,000-16,499 | 11 |
| 16,500-16,999 | 11 |
| 17,000-17,499 | 35 |
| 17,500-17,999 | 33 |
| 18,000-18,499 | 18 |
| 18,500-18,999 | 15 |
| 19,000-19,499 | 0 |
| 19,500-19,999 | 1 |
| | 125 |

The total population of the 63 districts having the least number of people is 1,072,286, which is equivalent to 48.79 percent of the total population of the state. In other words, a majority of the House of Representatives (63 members) would represent approximately 49 percent of the total state population.

Seventy-three of the 105 counties were kept intact, that is, no segment of any county was attached to another district. Fifteen of the remaining counties were divided because their populations were greater than the amount which entitled them to a whole number of representatives, using the same maximum deviation for the smallest and largest districts of 11 percent. In other words, to keep those counties intact would have produced a deviation

much greater than 11 percent. Each of the remaining 17 counties is a part of a district which has a deviation of less than 9 percent from the theoretical average-population district.

In comparing the voting power of a citizen under the Apportionment Act (Ch. 2, 1964 Special Session) declared unconstitutional in *Harris v. Anderson,* supra, with the present Act (House Bill No. 504), we note the following relevant factors: (1) that the range in population from the district having the lowest population to the district having the highest population was 2234 to 45,471 under the old law, and is reduced to 15,609 to 19,521 under the new law; (2) that considering 17,583 as the theoretical average district population (1965 census), the deviation from that average was 159 percent in the highest populated district and 87 percent in the lowest populated district under the old law, and is 11 percent for both the highest and lowest populated districts under the new law; (3) that the ratio of the highest district population to the lowest district population has been reduced from 20.4 to 1 under the old law, to 1.25 to 1 under the new law; (4) that the ratio of total population of the 63 smallest districts to the state total population has been increased from 19 percent under the old law, to approximately 49 percent under the new law; (5) that the number of single-district counties has been reduced from 100 under the old law, to 3 under the new law; (6) that all 105 counties were kept intact under the old law, and under the new law there are 73 (no segments attached to another district), and (7) that under the new law the most counties in one district are 5.

We think it is evident from the foregoing that the legislature followed a rational and logical plan of maintaining the integrity of the various counties, insofar as possible to permit faithful adherence to the equal-population rule announced in *Reynolds,* and providing for compact districts of contiguous territory in apportioning the representative districts of the state. It is permissible for the legislature to comply with the clear command of Article 10, Sections 1 and 2 of the Kansas Constitution, that county boundary lines be observed in the creation of representative districts so long as the basic standard of equality of population among districts is maintained. (*Reynolds v. Sims,* supra.) The districts created by the Act are compact and contain a population and area as similar as may be 'in their economical, political and cultural interests. Where population would permit, 73 districts were created by

keeping counties intact, and where the population rule would not permit, the remaining counties were divided, with deviation of less than 6, 9 and 11 percent. While mathematical exactness is not a constitutional requisite under either the state or federal Constitutions (*Harris v. Shanahan,* 192 Kan. 183, 205, 387 P. 2d 771; *Reynolds v. Sims,* supra), the mathematical exactness of House Bill No. 504 is impressive. As previously indicated, 97 of the 125 districts deviate less than 6 percent from the mean average, and all of the remaining 28, except two, vary less than 9 percent above or below the theoretical average district. Only two districts, the lowest populated and the highest populated, deviate 11 percent. Moreover, approximately 49 percent of the people of the state will elect 63 representatives. Viewed in its entirety, the current apportionment plan reveals a rational and conscientious state policy of providing representation for the people by observing county boundary lines in creating representative districts, which was abandoned only to the extent as was required by the overriding limitations of both the state and federal Constitutions of maintaining the basic standard of equality of representation. (*Harris v. Shanahan,* supra; *Reynolds v. Sims,* supra.)

Viewed in its extremes, the Act provides districts which vary in population little more than the 10 percent above or below the mean average which we found acceptable in *Harris v. Shanahan,* supra, pp. 189, 190, and below the 15 percent range of variation found by a three-judge federal court in Georgia to be the "departure figure" of reasonableness. (*Tombs v. Fortson,* 241 F. Supp. 65, 70 [1965].) Similarly, in *Sims v. Baggett,* 247 F. Supp. 96 (1965), a three-judge federal court noted the 15 percent figure adopted by the Georgia court, but disapproved the reapportionment of the Alabama House of Representatives for excessive deviation from the mean average and for racial gerrymandering. However, it approved the Alabama Senate apportionment in which the largest deviation was 25.7 percent from the mean, and said:

"In other respects, the Act relating to the reapportionment of the Senate contains no constitutionally impermissible deviation on the basis of population. The ratio of the population of the most underrepresented district to the population of the most overrepresented district is 1:1.459. The minimum percentage of the State's population which would be represented by a majority of the senators is 47.8%." (p. 106.)

Likewise, in *Baker v. Carr,* 247 F. Supp. 629 (1965), a three-judge court held that while mathematical analysis alone could not dictate whether the 1965 Act apportioning both houses of the Tennessee

legislature should stand or fall, two statistics were of great importance: (1) the ratio between the largest and smallest districts, and (2) the minimum percentage of population which could be represented by a majority of either house. The court held that where a majority of the 33-seat Tennessee senate represented a minimum percentage of 48.38 percent of the state's qualified electors, and the ratio between the largest and smallest senate districts, 78,922 and 56,996, was 1.38 to 1, the Senate apportionment in mathematical terms met *Reynolds'* requirement of equal-populated districts. The court approved the apportionment of the Tennessee House of Representatives which contained deviations of district populations to within 15 percent above and below the mean average, and held that such deviations met the equal-population requirement of *Reynolds.*

In *Schaefer v. Thomson,* 251 F. Supp. 450 (1965), a 3-judge federal court, noting the failure of the state legislature to provide a new legislative apportionment to replace one previously held invalid, judicially reapportioned the Wyoming legislature. In doing so, it stated:

"Mathematical precision is not a constitutional requisite. Reynolds v. Sims, supra. We have prescribed apportionment on a population basis, reducing the dilution in voting power from the ratio of 20 to 1 under the Wyoming Reapportionment Act of 1963 to the ratio of 2.08 to 1. It is not our goal to intrude on the state's political affairs; rather, we would formulate a basic pattern of equality in the right of suffrage to guide the state legislature in its future periodic readjustments and revisions as they become necessary to accommodate population shifts and growth." (p. 453.)

On appeal by intervenors who contended the judicial reapportionment did not satisfy the requirement of the equal protection clause, the United States Supreme Court, on February 28, 1966, affirmed. (*Harrison v. Schaefer,* 383 U. S. 269, 15 L. Ed. 2d 750, 86 S. Ct. 929.)

In *Yancey v. Faubus,* 251 F. Supp. 998 (1965), a 3-judge federal court approved a reapportionment of both houses of the Arkansas legislature in which no district in either house varied more than 15 percent from the mean average. On appeal, the United States Supreme Court affirmed a finding that such a variance did not offend the requirement of the equal protection clause of the Fourteenth Amendment. (*Crawford County Bar Association v. Faubus,* 383 U. S. 271, 15 L. Ed. 2d 750, 86 S. Ct. 933.) See, also, *Davis v. Cameron,* 238 F. Supp. 462 (1965), which suggests that, without holding, the Iowa House of Representatives with a 2.23 to 1 ratio in which 44-48 percent of the people could elect a majority, was "arguably close."

While apportionment of seats in a state legislature may be based on something other than total population (*Baker v. Carr,* supra), population variances contained in the Act are well within the limits approved by any of the decided cases, including *WMCA, Inc. v. Lomenzo,* 238 F. Supp. 916 (1965), affirmed *WMCA, Inc. v. Lomenzo,* 382 U. S. 4, 15 L. Ed. 2d 2, 86 S. Ct. 24.

When the Act is viewed as a whole, it is apparent that the legislature acted neither arbitrarily nor capriciously. On the contrary, the Act represents a diligent, earnest and good-faith effort on the part of the Kansas legislature to comply with this court's previous order to reapportion the House of Representatives in accordance with the requirement of equal-populated districts announced in *Reynolds.* Furthermore, we believe the minds of reasonable men could not doubt that a range of variance above and below the average district population of House districts created by the Act constitutes as close an approximation to equal representation as possible in conformity with Article 10, Sections 1 and 2 of the Kansas Constitution.

Accordingly, we hold House Bill No. 504 is constitutional and valid, meeting the standards of both the state and federal Constitutions, including the creation of representative districts as nearly of equal population as is practicable in the judgment of the legislature, and that the permissible bounds of legislative discretion have not been exceeded.

This holding concludes the litigation of this case, and it follows that judicial action has ceased.

FATZER, J., concurring: Under the compulsion of *Harris v. Anderson,* 194 Kan. 302, 400 P. 2d 25, cert. den. 382 U. S. 894, 15 L. Ed. 2d 150, 86 S. Ct. 185, I join the opinion and judgment of the Court sustaining the validity of House Bill No. 504.

PARKER, C. J., joins in the foregoing concurring opinion.