Eric **WALGREN** et al., Plaintiffs, Appellants,

v.

Merle **HOWES** et al., Defendants, Appellees.

No. 73-1045.

United States Court of Appeals, First Circuit.

Heard May 8, 1973.

Decided July 18, 1973.

5. 91 Congressional Record 11658 (1945) (Congressman Allen).

Eric Walgren, pro se.

David M. Roseman, Boston, Mass., with whom H. Theodore Cohen and Tyler & Reynolds, Boston, Mass., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Appellants Walgren, Glusco and Sherman,[1] proceeding *in forma pauperis*

---

1. Appellees' brief raises the question whether Sherman is properly a party in this litigation. Although he was not a named member of the alleged class in the complaint filed on January 10, 1973, appellants Walgren and Glusco amended this original complaint on January 16 to include Sherman. This amendment was, in effect, self-executing under F.R.Civ.P. 15(a) since a responsive pleading, as opposed to a motion to dismiss or for summary judgment, was not filed until February 2. 6 Wright & Miller, Federal Practice & Procedure: Civil § 1483

and *pro se*, appeal from an order of the district court dismissing their complaint against appellees, the members of the Board of Selectmen of the Town of Amherst, for alleged violation of, principally, the First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution in scheduling a special caucus for town elections on January 19, 1973 when the University of Massachusetts was in the midst of a semester recess.[2] We vacate the order of the district court and remand for further consideration in accordance with this opinion.

All three appellants claimed to be resident voters of the Town of Amherst, 51 M.G.L.A. ch. 51, § 1. Walgren was a candidate for the office of selectman. Sherman is a full-time undergraduate student at the University, residing in one of its dormitories. They were concerned that the Board of Selectmen, as it had done since 1939, had set the annual town election for the third week in February. In accordance with state law,[3] a "special caucus" in the nature of a non-partisan primary election would be necessary in the event that more than twice as many candidates as the number to be elected for an office might file nomination papers, and such caucus would have to be held at least 31 days, before the town election. Appellants realized that any such special caucus would take place in mid-January when, as alleged in Sherman's affidavit, "most students who reside on compus during the academic year are required by university policy to vacate their residences and therefore do so." In that event, it was claimed, a large number of young persons enfranchised by the Twenty-Sixth Amendment would be discouraged from voting since they would have to use the cumbersome and less meaningful method of voting by absentee ballots.

Appellant Walgren, concerned about the youth and student vote, arranged to appear at a Board meeting on December 11, at which time he endeavored to persuade the Board to rearrange the election schedule to encourage maximum voting in the college community. The Board agreed to do so if it was legally permissible,[4] and upon advice of counsel adopted at its December 18 meeting a new election schedule providing for the special caucus to be held on January 29, after the University would have commenced its second semester. Between December 11 and December 18, appellants alleged, the Board received numerous telephone calls from older town residents who objected to plans to accommodate student voters. There being some confusion whether the dates proposed by counsel were in accordance with state law, the Board met and voted on December 19 to adhere to its initial plans to hold the special caucus during the semester recess, simultaneously rejecting another plan prepared by its counsel attempting to eradicate all doubts as to compliance with state law.[5]

---

(1971); Keene Lumber Co. v. Leventhal, 165 F.2d 815 (1st Cir. 1948).

This case presents an example of a fairly complex matter, the presentation of which has been inhibited and distorted by the absence of counsel. The court, the parties, and the issues would profit by the presence of counsel on both sides.

2. Appellants' complaint also stated that Amherst and Hampshire Colleges were essentially out of session on January 19, although there was admittedly a three-week January term in progress at those colleges which some students do attend. For purposes of appeal, appellants stated that they would focus solely on the University of Massachusetts. We limit discussion here to that focus.

3. Caucus Act, ch. 149, Acts of 1955, as amended by ch. 54, Acts of 1963.

4. Previous counsel retained by the Board advised it that it could not change the election dates.

5. The original election schedule provided for the special caucus to be held on January 19 and the annual election on February 20. The Board's vote on December 18 was to change the dates to January 29 and March 1 respectively. Counsel then advised the Board that these new dates, which he himself had

Thereupon appellants filed this suit, contending that the Board action in returning to the initial election schedule, violated the First, Fourteenth and Twenty-Sixth Amendments to the United States Constitution; that it "willfully discourages and prevents full participation in the electoral process by an entire constituency of voters—some 30 per cent of the registered voters of the Town of Amherst";[6] that the action was arbitrary, discriminatory, and had the purpose to disenfranchise the new student vote in the local elections of Amherst, and to prevent the election of [Walgren] and others, who might represent the interests of young people . . ." They sought to maintain the suit as a class action.

On January 17 the district court denied temporary relief and the special caucus took place as planned.[7] Subsequently appellees replied with a motion to dismiss the suit under F.R.Civ.P. 12 for lack of subject matter jurisdiction, and failure to state a claim upon which relief could be granted, and alternatively, moved for summary judgment. They also claimed that the suit was not properly maintainable as a class action.[8] Affidavits from various officials at the affected educational institutions were filed. A few weeks later, the court not having ruled on these motions, appellees filed an answer to the complaint which is most easily summarized by stating that it denied virtually all of appellants' allegations. A hearing was held the day the answer was filed, though the record does not contain a transcript or a summary of testimony. Some days later the district court issued its order, granting appellees' motions for summary judgment and dismissal for failure to state a claim.

■■ We first note that the district court should not have granted a summary judgment. F.R.Civ.P. 56 may be utilized only when there is "no genuine issue as to any material fact". Here almost all of the factual claims of appellants were denied by appellees in their answer. Moreover, the affidavits did little to dissolve that real factual controversy. For example, at least one important issue in the case—whether the residence halls at the University were generally closed to students during the semester break so that for this or perhaps another reason a large number of students left town during that period—could not be resolved without an evidentiary hearing. "Summary judgment is not a substitute for the trial of disputed factual issues." 10 Wright & Miller, Federal Practice & Procedure: Civil § 2712 at 379 (1971); cf. Briggs v. Kerrigan, 431

recommended, did not comply with state law that the caucus be "at least thirty-one days before the town election", and on December 19 he submitted a new proposal, keeping the caucus on January 29 but changing the election to March 5.

6. Appellants alleged that after the Twenty-Sixth Amendment became operative, the number of registered voters in Amherst rose from 7,682 to 11,413 in less than one year.

7. The occurrence of the election did not moot this controversy, and mootness was never raised as a defense. The mid-January special caucus date has been used for some 39 years now, and the town's defense of it here indicates that its selection of the date, if not reviewed now, would be "capable of repetition, yet evading review". Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 1249, n. 5, 36 L.Ed.2d 1 (1973).

8. The district court did not determine, even conditionally, whether the suit could be maintained as a class action. F.R.Civ. P. 23(c)(1). Voting rights suits, frequently addressing important and broad public issues, often of constitutional dimension, have traditionally been litigated as class actions. See, e. g., Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed. 2d 274 (1972); Kramer v. Union Free School District, 395 U.S. 621, 625, 89 S. Ct. 1886, 23 L.Ed.2d 583 (1969). There is nothing unusual about certifying the existence of a 23(b)(2) class here, at least as to the large, identifiable class of student voters sought to be represented by Sherman. See Newburger v. Peterson, 344 F.Supp. 559 (D.N.H.1972); Sloane v. Smith, 351 F.Supp. 1299 (M.D.Pa. 1972).

F.2d 967 (1st Cir. 1970). *See* Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

■ That the court improperly granted summary judgment does not end our inquiry, for the court also dismissed the suit for failure to state a claim. F.R. Civ. P. 12(b)(6). A remand, therefore, without addressing appellants' legal arguments in some respect would be less than helpful. We cannot emphasize enough the rule that a court should not dismiss a complaint under 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Ballou v. General Electric Corp., 393 F.2d 398 (1st Cir. 1968). For the reasons hereinafter enunciated, we believe that appellants have presented legal issues which can be resolved only after a trial on the merits.[9]

We first address appellants' equal protection claim under the Fourteenth Amendment. The appellants argue that the town law setting the election date interferes with the equal exercise of the franchise right—i. e., one large, identifiable class is said to have been deprived of the opportunity to visit personally the polls and must utilize instead the allegedly more cumbersome and less effective method of voting by absentee ballot. They add that the right to participate in elections on an equal basis with other citizens has been denominated a fundamental right, Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *see also* San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). They conclude therefore that any infringement of that right must be scrutinized under the compelling interest test. *Harper, supra*; Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Dunn v. Blumstein, 405 U. S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

■ We do not view the compelling interest test as applicable here. There being no allegation that the town has improperly denied absentee ballots to residents requesting them, it has not "totally denied the electoral franchise to a particular class of residents [such that] there [might be] no way in which the members of that class could [make] themselves eligible to vote." Rosario v.

---

9. By so saying, we have to our own satisfaction answered the town's argument that since absentee ballots are made available to voters as a privilege, they cannot complain that it is burdensome to make use of them. We recognize that both McDonald v. Board of Election Commissioners, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), and Fidell v. Board of Elections of City of New York, 343 F.Supp. 913 (E.D.N.Y.), aff'd, 409 U.S. 972, 93 S.Ct. 310, 34 L.Ed.2d 236 (1972), lend some support to the town's argument. *But cf.* O'Brien v. Skinner, 409 U.S. 1240, 93 S. Ct. 79, 34 L.Ed.2d 211 (Marshall, Circuit Justice, 1972); prob. juris. noted, 411 U.S. 963, 93 S.Ct. 2141, 36 L.Ed.2d 683 (1973). But both *McDonald* and *Fidell* took as a given what is the fundamental challenge here, the propriety of the election date. In neither case was a change in the election date at issue; the claim in each was a right to an absentee ballot simpliciter, assuming no other defects in the electoral process. Moreover, neither case presented the claim that a particular date was established with the effect that the absentee ballots of a large and definable class, with predictable absence at the time of the election, would be cast with more difficulty and less information on issues and candidates than those of other groups, thus unnecessarily diluting the value of the ballot for certain groups of voters. In such circumstances it seems somewhat disingenuous to speak of benevolence in providing the absentee ballot method of voting.

Rockefeller, 93 S.Ct. 1245, 1249 (1973).[10] We believe that the instant case, if considered simply as one in which a large, identifiable class is burdened by the choice of a particular election date, must track the analysis in *Rosario*, rather than apply the more rigorous compelling interest standard.

The Court engaged in three inquiries. It first considered whether the time limitation before it was "so severe as itself to constitute an unconstitutionally onerous burden" on the exercise of the franchise and freedom of political association. It then asked whether it was "an arbitrary time limit unconnected to any important state goal" which must, of course, be "a legitimate and valid state goal". *Id.* 93 S.Ct. at 1251. Finally, the Court noted that there were no less drastic (and feasible) means to effectuate the state's goal. *Id.* 93 S.Ct. at 1252 n. 10.

■ The district court must therefore attempt to assess the nature and weight of the burdens inherent in absentee voting—the separate application, the taking of an oath, and execution of an affidavit, payment of the postage and notary fees, M.G.L.A. ch. 51, § 86 et seq., *cf.* Bishop v. Lomenzo, 350 F.Supp. 576, 583–584 (E.D.N.Y.1972), the risk of delay, etc. The judicial inquiry should be focused on the extent of other obstacles, not merely technical, to casting an effective and informed vote. The state goals involved would seem to include the minimizing of fraud, accidental error, disruption of ongoing public and private activities, delay in determining outcome, voter confusion, and the maximizing of voter participation and appraisal of candidates and issues. The connection of the election date to these goals can be answered only by factual inquiries. Lastly, where an election date is set by a town vested with absolute discretion, and the chosen date is found to bear demonstrably on a large and identifiable class of voters, to their disadvantage, the court should explore the feasibility of other dates which have a lesser adverse impact on these voters.

While appellants may be able to meet the burdens of proof imposed upon them under *Rosario, supra,* their task is not easy. They argue, however, that the town must justify its choice of the election date because there has been an abridgement of the right to vote on account of age in violation of the Twenty-Sixth Amendment. Testing the action of the town under this amendment poses new problems of analysis. Few cases have been decided under it and none pose a fact situation similar to the instant one. Our guidance at this stage of the proceedings is necessarily limited. Perhaps most clear is the purpose of the amendment in the light of its history. In addition to avoiding what would have been an administrative nightmare brought upon by the decision in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970),[11] the backers of

---

10. The Court's concept of total denial is somewhat less than absolute. Its reference to other cases indicates that it views substantial inconveniences and unrealistic expectations as tantamount to denial of the franchise. In *Dunn*, the would-be voters would not have been disenfranchised had they relocated their homes some months earlier than planned. Those in *Cipriano* and *Kolodziejski* could have purchased or leased property, as could the complainant in *Kramer*, though he had the alternative of becoming a parent. All of these conditions are, of course, onerous burdens which, as a practical matter, could not be expected to be met in order to vote. And in *Carrington* there was an absolute disenfranchisement by the state of all service men and women. These burdens, which trigger the compelling interest test, are to be compared with what the Court saw as the lighter burden of registering to vote in a party primary some 11 months before the primary and what are here said to be the added costs, inconvenience and ineffectiveness of absentee voting.

11. By upholding Congressional action in setting the voting age at 18 in federal elections, but striking down the part of the same statute doing the same for state and local elections, the Court had created a situation in which states and localities would have to keep separate voting lists, maintain special ballots, etc.

the amendment argued that, young persons between 18 and 21 being otherwise treated as adults for purposes of civil and criminal responsibility and military service, it was anomalous to deny them the franchise right; and that the frustration of politically unemancipated young persons, which had manifested itself in serious mass disturbances, occurring for the most part on college campuses,[12] would be alleviated and energies channeled constructively through the exercise of the right to vote. It is this latter goal, seeking to substitute the ballot for the bullet, with which we are concerned. Thus, while the Twenty-Sixth Amendment speaks only to age discrimination, it has, as noted by Senators Percy and Brooke, among many other legislators, particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment. 117 Cong.Rec. 5817, 5825.

While both the Fifteenth and Nineteenth Amendments served as models for the Twenty-Sixth,[13] more case law has developed under the Fifteenth. Most relevant would seem to be the general admonitory teaching of Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). Justice Frankfurter, addressing the question whether the Fifteenth Amendment was violated by a state statute which, though neutral on its face, had the effect of enfranchising all white voters through a grandfather clause, while requiring black would-be voters to register within a twelve day period or forever lose the franchise right, wrote as follows:

> "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." *Lane, supra* at 275, 59 S.Ct. at 876.[14]

At other times, the Supreme Court has been even less explicit in its analysis under the Fifteenth Amendment. *See, e. g.,* Hadnott v. Amos, 394 U.S. 358, 364, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); Lassiter v. Northampton County Board

12. *See, e. g.,* The Report of the President's Commission on Campus Unrest (Arno Press, N.Y., 1970). Typical of the debate in the House are the following. Congressman Matsunaga said, "although some of the student unrest of recent years has led to deplorable violence, much of this unrest reflects the concern of today's youth about the important issues of our time. We must direct their energies into our political system and give our young people genuine opportunities to influence our society in a peaceful and constructive way." 117 Cong.Rec. 7543 (March 23, 1971). Congressman Anderson of Illinois noted that not all students were radicals, and that the Twenty-Sixth Amendment could alleviate legitimate student concerns which were unfortunately expressed by violent means on college campuses. *Id.* at 7556–58. Congressman Leggett similarly noted that campus unrest could be expected to decrease if the amendment were adopted. *Id.* at 7550.

13. For example, House Judiciary Committee Chairman Celler said, "This provision is modeled after similar provisions in the fifteenth amendment, which outlawed racial discrimination at the polls, and the nineteenth amendment, which enfranchised women." 117 Cong.Rec. 7533. And according to Congressman Pepper, "What [is] propose[d] to do in the Federal enfranchisement of those 18, 19 and 20 years of age is exactly what [was done] in enfranchising the black slaves with the fifteenth amendment and . . . in enfranchising women in the country with the nineteenth amendment." *Id.* at 7539.

14. While the result of the procedural requirement in *Lane* was permanent disenfranchisement, the result could have been avoided by registering within the twelve day period, just as appellants here could have made decisions to stay in town or to utilize the absentee ballot process. Arguably, a requirement which would pass scrutiny absent a constitutional amendment becomes vulnerable if it bears sufficiently disproportionately on the class selected for constitutional attention. Nor does presence or absence of intent to discriminate against the protected class seem relevant in many circumstances. *See, e. g.,* United States v. McElveen, 180 F. Supp. 10 (E.D.La.), aff'd sub nom., United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535 (1960).

of Elections, 360 U.S. 45, 50–54, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). No clear test has yet emerged to help determine when a statute, which has the effect of placing an unequal burden on a class protected by a voting amendment, may be justified by some compelling governmental objective unobtainable by any less drastic means; or when the burden is so selective and egregious on its face as to constitute an "abridgement" per se.

■ In this case, a town, given discretion under state law to hold its elections almost anytime, has exercised that discretion with the effect of imposing additional procedural requirements and other disadvantages, inherent in the absentee voting process, on what is alleged to be a large group of young voters, said to be some thirty per cent of those eligible to vote in the town election. A violation of the Twenty-Sixth Amendment is said to have occurred. The parties have not adequately argued this point before us and we prefer to leave its resolution, in the first instance, to the district court. Without attempting to define the boundaries of "abridgement", we deem it sufficient to state, for now, that it seems only sensible that if a condition, not insignificant, disproportionately affects the voting rights of citizens specially protected by a constitutional amendment,[15] the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective. In other words, the voting amendments would seem to have made the specially protected groups, at least for voting-related purposes, akin to a "suspect class", to use the contemporary label. Of course, if the court were to find the burden of such a significant nature as to constitute an "abridgement", it presumably would not take the additional step of considering the adequacy of governmental justification.

The passage of a constitutional amendment does not take place lightly. It creates serious problems of accommodation as the Fifteenth Amendment demonstrated. The specific problem faced by college communities with concentrated youth populations was faced in the consideration of the Twenty-Sixth Amendment. To the expressed fears of campus takeovers of small communities —since "the student body [is] composed largely of 18 to 21-year-olds"—the candid response in debate was that if students "satisfy the residency requirement of that town obviously they would be entitled to vote." 117 Cong.Rec. 7538–39, 7547. This is the same answer that the Court gave to the same concern in *Carrington, supra* 380 U.S. at 94, 85 S.Ct. at 779: "'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *See also Dunn, supra,* 405 U.S. at 356 n. 28, 92 S.Ct. 995.

As Congressman Randall said, "It is quite possible that there may be other laws governing non-Federal elections in

15. We note, for example, that in *Lassiter, supra,* 360 U.S. at 51, 79 S.Ct. at 990, the Court was explicit in stating that "literacy and illiteracy are neutral on race, creed, color, and sex . . . . " Here the claim seems to be that absence during the election date chosen has a definite relationship to the class protected by the Twenty-Sixth Amendment. The "college town" presents a voter profile and implications quite different from those of other cities. In the latter, the younger voters might well contain a large proportion of non-students. And a large proportion of student voters might well be attending universities without, as well as within, the city. In such a situation, the city would have a major portion of the electorate to whom the choice of an election date was a matter of indifference and minor segments of students, with conflicting patterns, either returning to or leaving the city during their vacations. In this dilemma, the city's choice of dates could not readily be said to constitute unfair treatment of any one group, nor of the class as a whole which is protected by the Twenty-Sixth Amendment.

the various states which will have to be changed to prevent conflict with the proposed intent of this amendment." 117 Cong.Rec. 7565. The determination whether there is an impermissible conflict with one or more of the goals of this amendment will, should the court reach this issue, admittedly call for sensitive analysis. We cannot say whether or not the election date set by Amherst will prove to be one of the non-federal decisions which are vulnerable under the new amendment. Enough has been said to indicate that this case, appearing no doubt to some as an unnecessary irritant in municipal life, encompasses questions both broad and deep.

Judgment vacated; case remanded for further proceedings consistent with this opinion.