No. 51,000

PETITION OF THE ATTORNEY GENERAL, ROBERT T. STEPHAN, TO DE-
TERMINE THE VALIDITY OF HOUSE BILL NO. 2620.

(595 P.2d 334)

Opinion filed May 5, 1979.

The opinion of the court was delivered by

FROMME, J.: Robert T. Stephan, Attorney General of the State of Kansas, has petitioned this court to determine the validity of House Bill No. 2620 reapportioning the state legislative districts. This reapportionment procedure is required by Article 10, Section 1 of the Kansas Constitution.

Though not technically an adversary proceeding, all persons responding to the court's notice of hearing entered appearances in opposition to the apportionment in House Bill No. 2620. These persons are:

1.  George E. Collins
    Olathe, Kansas
2.  Kansas Coalition on Reapportionment

MEMBERS ———— 
) Common Cause in Kansas
) League of Women Voters
) of Kansas
) American Civil
) Liberties Union—Kansas
) Kansas Women's
) Political Caucus

Co-chairpersons ) John R. Mettner, Jr.
) Common Cause in Kansas
) Topeka, Kansas
) Barbara Neff
) League of Women Voters of Kansas
) Topeka, Kansas

3.  Harold E. Bingham
    Shawnee Mission, Kansas
4.  Harold Seymour
    Manhattan, Kansas
5.  The University of Kansas
    Student Senate ) Margaret Berlin
) K. U. Student Body President
) Lawrence, Kansas
) Jeff Chanay
) Student Senator
) Lawrence, Kansas

6. Douglas County Democratic Central Committee
   ) David Berkowitz
   ) Lawrence, Kansas
   ) Steven Treaster
   ) Lawrence, Kansas
   ) Garth Burns
   ) Lawrence, Kansas

Arguments were made to the court by:

1. Tom Green
   Assistant Attorney General
   Topeka, Kansas
2. Douglas County Democratic Central Committee
   By: David Berkowitz
   Lawrence, Kansas
3. Lawrence C. Gates
   Mission, Kansas
4. University of Kansas
   By: Margaret Berlin
   K. U. Student Body President
   Lawrence, Kansas
5. John Solbach
   Representative—45th District
   Lawrence, Kansas

The court wishes to express its appreciation to the attorney general and to those who responded to our invitation to assist in the hearing on House Bill No. 2620. The suggestions, both oral and in writing, helped to pinpoint problem areas and enabled the court to focus its attention on those areas.

A similar proceeding was begun in March, 1979, in which this court on April 4, 1979, upheld the validity of 1979 Senate Bill No. 220, which senate bill reapportioned the senatorial districts. *In re Senate Bill No. 220*, 225 Kan. 628, 593 P.2d 1 (1979).

Article 2, Section 2 of the Kansas Constitution provides:

"The number of representatives and senators shall be regulated by law, but shall not exceed one hundred twenty-five representatives and forty senators. Representatives and senators shall be elected from single-member districts prescribed by law. . . ." 1978 Supp.

The legislature has again provided for 40 senators and 125 representatives, the maximum permitted by the constitution. The 125 single member representative districts were previously delineated in K.S.A. 4-301 *et seq.* These statutes were repealed by

House Bill No. 2620 and the legislature has reapportioned all districts in the State of Kansas for the purpose of equalizing the population in each district. As the districts were constituted under K.S.A. 4-301 *et seq.*, the districts varied in population from a high of 32,332 in District No. 30 to a low of 15,268 in District No. 86. Under House Bill No. 2620 the districts vary in population from a high of 19,819 in District 41 to a low of 17,949 in District 7.

The constitutional principle underlying reapportionment litigation is founded on Fourteenth Amendment equal protection concepts. It requires that one person's vote in an election be worth as much as another person's vote as nearly as district population apportionment will permit.

Population is the controlling criterion in legislative apportionment cases. Insignificant variations from the population of the ideal district are permitted without justification unless there is established a convincing violation of equal protection of voting rights. Even a significant variation from the ideal district population may be justified by establishing there is a rational state policy basis for such deviation. *In re Senate Bill No. 220,* 225 Kan. 628.

The question which logically comes to mind is—Where do courts draw the line between insignificant and significant variations in district populations? This line must be gleaned from federal cases. In *White v. Regester,* 412 U.S. 755, 37 L.Ed.2d 314, 93 S.Ct. 2332 (1973), a total maximum variation of 9.9% was approved as an insignificant variation which needed no rational state policy to justify the variation. In *White v. Regester* it is said:

"Insofar as the District Court's judgment rested on the conclusion that the population differential of 9.9% from the ideal district between District 3 and District 85 made out a prima facie equal protection violation under the Fourteenth Amendment, absent special justification, the court was in error. It is plain from *Mahan v. Howell,* 410 U.S. 315 (1973), and *Gaffney v. Cummings, ante,* p. 735, that state reapportionment statutes are not subject to the same strict standards applicable to reapportionment of congressional seats. . . ." 412 U.S. at 763.

In *Connor v. Finch,* 431 U.S. 407, 52 L.Ed.2d 465, 97 S.Ct. 1828 (1977), when examining the apportionment by the Mississippi Legislature, the high court held that maximum variations of 16.5% in population of the senate districts and 19.3% in population of the house districts were impermissible when not explained or justified by the proponents on some rational state policy basis.

Under 1979 Senate Bill No. 220 the maximum variation in population of the senate districts in Kansas is 6.5%. Under 1979 House Bill No. 2620 the maximum variation in population of the representative districts is 9.9%. We believe both of these maximum variations are insignificant. In both cases the variations need not be explained or justified on a rational state policy basis.

We note in the special report of the committee on Legislative, Judicial and Congressional Apportionment, which was spread in the Journal of the House on February 26, 1979, the following:

"1. As required by the U.S. Constitution and the case law of both the state and federal courts interpreting the same, the districts should be numerically equal in population as nearly as practicable and the population of House districts should be within plus or minus 5% of the ideal population (which is 18,874) except in unusual circumstances. Kansas is one of the relatively less populated states and population of House districts in Kansas is relatively small in comparison to a large majority of the other states. The plus or minus 5% population variance guideline permits a very reasonable equality in the House districts since the variance in the number of persons within this guideline permits a practical attainment of numerical equality especially when other factors such as the relatively large expanse of geographical area contained in Kansas districts in relation to population are considered.

"One percent (1%) deviation from the ideal population for a House District is only 189 people and a five percent (5%) deviation is only 944 people. The smallest unit available to the Committee for the census figures is the precinct, which is generally used within cities. Otherwise townships were the smallest unit available as a 'building block' for drawing district boundaries. Precinct boundaries are established by election officials generally with a view towards the most practical and efficient management and conduct of elections. As a result a vast majority of the basic units (or 'building blocks') of population available to use in drawing the House districts represent more people in each unit than a 1% deviation from the ideal population. In the larger cities and metropolitan areas these basic units each represent a considerably higher percentage of the ideal population of a district.

"Since the basic units of population generally represent more than 1% of the ideal House district population it was difficult to create districts as equal in population as practicable with boundaries that were easily identifiable and understandable and stay within the plus or minus five percent deviation."

The foregoing explains some of the difficulties encountered by the committee, and by the legislature itself, in such areas as Johnson, Wyandotte, Douglas, Shawnee, Reno, and Sedgwick Counties. The "building blocks" in these areas were the voting precincts. A single voting precinct in most cases would have from 1,000 to as high as 4,000 "census persons." The voting precincts must be kept intact when shifting or transferring population from

an overpopulated district to another district. A precinct containing 3,000 "census persons" represents a 16% variation from the ideal district population. When such a precinct is removed from one district it reduces the number of "census persons" by 16%. When added to a district it increases the number of "census persons" by 16%. Such a percentage from the ideal district population is a significant deviation, and one which must be fully justified on some rational state policy basis if it is to remain.

For the purpose of reapportioning the representative districts the legislature used the same census as it did in reapportioning the senatorial districts, the 1978 Board of Agriculture Census. Therefore apportionment in Kansas is based on "census persons." Such a source has generally been approved when the census has been recently taken. See *Reynolds v. Sims,* 377 U.S. 533, 544, 12 L.Ed.2d 506, 84 S.Ct. 1362 (1964), and *Harris v. Anderson,* 196 Kan. 450, 451, 412 P.2d 457 (1966). We believe this 1978 census was a proper population basis for reapportionment.

To arrive at the ideal district population for the 125 representative districts in Kansas, the legislature took the population of the state (2,359,262), divided it by the number of representative districts (125), and arrived at the ideal district population (18,874). To apportion the Kansas House of Representatives using the 18,874 figure as the ideal district population, certain difficulties became apparent. In apportioning the senate districts the ideal population was 58,982 and it took 590 "census persons" to change the ideal population of a senate district 1%. In apportioning the representative districts the ideal population is only 18,874, and it took only 189 "census persons" to change the ideal population of a representative district 1%. A 5% deviation over and a 5% deviation under the ideal district population appears to be the line drawn by the federal courts. If the total maximum variation is over 10%, proper justification for such a variation appears to be necessary. Justification may be established by showing that the variations came about as a result of some rational state policy, such as the use of high population precincts, natural boundaries or physical barriers.

The "building blocks" which have to be used in urban areas in Kansas are the voting precincts. We note that the population of the voting precincts in these urban areas runs well over 944 voters in most instances. Under these circumstances it is apparent that

reapportionment requires a trade off of precincts in order to bring the voter strength to within 5% of the ideal district population. This is one of the reasons why it was neither possible nor practical to lower the total maximum variation below 9.9% for the legislative districts, and yet for senatorial districts a total maximum variation of 6.5% was accomplished.

Under the equal protection clause of the Fourteenth Amendment, a state must make an honest and good faith effort to construct its legislative districts as nearly of equal population as is practicable, but since absolute equality is a practical impossibility, mathematical exactness or precision is not a constitutional requirement. *Mahan v. Howell,* 410 U.S. 315, 35 L.Ed.2d 320, 93 S.Ct. 979 (1973).

We have examined the various rural representative districts. The "building blocks" used to make up these districts are the counties and townships. A large majority of the counties were placed entirely within a district. It was only when necessary to achieve a district population close to the ideal that the legislature has resorted to townships and thus has split a county. After studying the counties which have been split between two districts, it appears in each case the split was necessary in order to equalize a district population. The only choice available was to decide which county to split in equalizing a particular district population. These divisions do not appear to have been engineered in order to cancel out voting strength of racial or political elements of the voting population.

Our examination of the urban centers discloses that it was not possible to preserve county or township lines. However, it is apparent a valid attempt was made to preserve city boundaries and within the cities the "building blocks" used to equalize the district populations were the voter wards and precincts.

Although we find all legislative districts as reapportioned are substantially equal in population that does not terminate our inquiry. State legislative districts may be substantially equal in population and still be vulnerable under the Fourteenth Amendment. A districting statute otherwise acceptable may be invalid because it fences out a racial group so as to deprive them of their preexisting municipal vote. *Gomillion v. Lightfoot,* 364 U.S. 339, 5 L.Ed.2d 110, 81 S.Ct. 125 (1960). Substantially equal districts may be invidiously discriminatory because they were organized

in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population. *Fortson v. Dorsey,* 379 U.S. 433, 439, 13 L.Ed.2d 401, 85 S.Ct. 498 (1965).

Some question has been raised concerning District 56 in the city of Topeka because the district is in two parts and the two parts do not appear to be contiguous on the city map. An examination of a map of the voting precincts in the city of Topeka prepared by the city Election Commissioner indicates certain facts. The two areas which appear on the map are joined by a strip of land 420 feet wide and 660 feet long owned by the State Department of Transportation and over which passes Highway 24 and a frontage road. The area so joined is voter precinct 7 of ward 1 in the city of Topeka. The entire precinct was properly placed in one representative district.

There appears no requirement imposed by federal law of contiguity and compactness of congressional districts. *Meeks v. Avery,* 251 F. Supp. 245, 250 (D. Kan. 1966); *Skolnick v. State Electoral Board of Illinois,* 336 F. Supp. 839, 843 (N.D. Ill. 1971); *United Jewish Org. of Williamsburg, Inc. v. Wilson,* 377 F. Supp. 1164 (E.D. N.Y. 1974). All of the above cases rely on *Wood v. Broom,* 287 U.S. 1, 77 L.Ed. 131, 53 S.Ct. 1 (1932), to support the statement that contiguity is not a requirement imposed by federal law.

However, all courts generally agree that lack of contiguity or compactness raises immediate questions as to political gerrymandering and possible invidious discrimination which should be satisfactorily explained by some rational state policy or justification. The area of a congressional district should be reasonably contiguous and compact under a proper apportionment plan and, if not, a satisfactory explanation should be given by the proponents of the plan so as to remove any question of gerrymandering and invidious discrimination. The obvious explanation in the present instance is that the area was all part of a single voting precinct and had to be placed in one representative district for voting purposes. In addition the areas are joined by a strip of land 420 feet wide and 660 feet long and no claim or showing of gerrymandering or discrimination has been made.

The attorney general as well as others who appeared on April 18, 1979, and took part in the public hearing on the bill have pointed out other areas of concern which we now examine.

The first question raised concerns Districts 103 and 104 in Reno County. A suggestion is made of possible "gerrymandering" based on the shape of the districts. The area of each district appears to us to be fairly compact and contiguous. Both districts have a minus deviation from the ideal district population of close to 4% and are within the city of Hutchinson. The "building blocks" used were voting precincts containing heavy populations.

No claim or suggestion has been made by anyone that the shaping of the districts was for the purpose of minimizing or cancelling the voting strength of any racial or political element of the voting population. These districts appear validly apportioned.

A similar question has been raised concerning Districts 84, 86, 87, and 97 in Sedgwick County. These districts are within the city of Wichita. Populations vary from 18,880 in District 84, to 19,574 in District 86. The "building blocks" used in constructing the districts are again the voter precincts. In explaining the difficulties and reasons for variation in population and in the shape of these districts, the house committee in a report spread on the Journal of the House noted the reasons for these variations. It stated that shifting 944 people caused a 5% deviation and most precincts in these districts had populations with wide variances. Using the precinct "building blocks" required special effort because of the constraints of major thoroughfares and barriers such as rivers and drainage ditches. The committee in commenting on these districts said, "They are as compact as possible and contiguous and were constructed as close to the ideal population as practicable."

Again we note that no claim has been made and no evidence has been offered which would indicate the size and shape of these districts were engineered to cancel out voting strength of racial or political elements of the voting population. We hold the districts are properly apportioned.

The next suggestion of gerrymandering concerns Districts 35 and 36 in Wyandotte County. These districts appear to be within the city of Kansas City just south of the river. The districts extend generally in an east-west direction and District 35 runs along the river. The deviations from the ideal population are from a plus 0.9% to plus 2.3%. The boundaries of the districts tend to follow natural boundaries such as the river, the railroad and the thor-

oughfares. The major difficulty encountered was in using precincts as the "building blocks." The precincts were large in comparison to the 944 person leeway permissible.

Again we note that no claim has been made and no evidence has been offered which would indicate the size or shape of these districts were "gerrymandered" to cancel voting strength of racial or political elements of the voting population. We hold the districts are properly apportioned.

The next group of districts about which questions have been raised are Districts 18 to 30 inclusive in Johnson County. Johnson County is a growing area in which various cities exist side by side and which cities have annexed a majority of the area of the county. These districts as presently apportioned are as follows:

| District | Population | Deviation from ideal |
|----------|------------|----------------------|
| 18 | 18,706 | - 0.9 |
| 19 | 19,197 | + 1.7 |
| 20 | 19,205 | + 1.8 |
| 21 | 18,571 | - 1.6 |
| 22 | 19,130 | + 1.4 |
| 23 | 18,984 | + 0.6 |
| 24 | 19,479 | + 3.2 |
| 25 | 19,252 | + 2.0 |
| 26 | 18,738 | - 0.7 |
| 27 | 18,226 | - 3.4 |
| 28 | 19,080 | + 1.1 |
| 29 | 19,000 | + 0.7 |
| 30 | 18,950 | + 0.4 |

We note from the map of the districts as now constituted that Districts 24 and 25 which have the largest plus deviation are in areas of the greatest present concentration of people. Room for further growth in population is limited. District 24 is bounded on the north by the county line. It is bounded on the east by District 25. District 25 is bounded on the north and east by the county line. The east county line coincides with the state line. No empirical studies of growth patterns have been supplied to this court but it would not appear the growth in that county would be in these two districts as much as it would be in the outlying areas of the county. Districts 18, 26, 27, 28, 29, and 30 appear to be

areas with growth potential. These latter districts all have populations close to the ideal district population (18,874).

Complaint is also made that the municipal boundaries of the city of Prairie Village were not preserved and that six sides of that city were encroached upon and taken into other districts. We note that in Johnson County various cities are compacted and exist side by side. It would be impossible to honor municipal boundaries.

The special report of the Committee on Apportionment in the House Journal states:

"Because of the numerous cities with contiguous borders located within this area it was necessary to break city lines in several places to achieve a reasonable population balance and to hold the population as near the ideal as practicable. Where possible an entire city was included wholly within a district. The cities of Lenexa, Merriam, Leawood, Mission Hills, Mission Woods, Westwood, Countryside, Westwood Hills and Spring Hill are wholly within a district while the cities of Shawnee, Olathe, Overland Park, Prairie Village, Fairway, Roeland Park and Mission have areas which have been placed in two or more districts to achieve population balance as near the ideal as practicable. . . ."

We note the committee stated it had arranged for minus deviations in districts in the growing areas and for plus deviations in districts that had experienced a declining population in the last few years. So there is a population shift away from the core area.

Charges have also been leveled that certain areas were severed from Prairie Village, a Republican stronghold, to shore up the chances of the Republican legislators in the surrounding districts. These unsubstantiated charges are somewhat suspect one considering that all districts in Johnson County, Districts 18 through 30, are presently filled by members of the Republican Party. The reapportionment in Johnson County is approved.

The final area in which concern was expressed over reapportionment is that of Douglas County, the city of Lawrence in particular. As the districts were previously constituted the city of Lawrence was largely in District 44. District 43 covered the east portion of Douglas County and picked up precincts in the northeast and the southeast portions of the city. District 45 covered the west portion of Douglas County and picked up some of the west precincts of the city of Lawrence.

Because of population growth in this area the reapportionment committee saw fit to add one new representative district in this county. This was accomplished by removing District 46 from

Jefferson and Leavenworth Counties and inserting a new District 46 between District 44 and District 43 in Douglas County. District 43 was moved to the east into Douglas County and expanded into west Johnson County. The boundaries of District 45 were moved further west and now include less of the city of Lawrence. District 44 was moved further west in the city of Lawrence. As the district lines now are drawn District 44 and District 46 largely cover the city. District 43 and District 45 lie outside the city.

Memorandums were filed in this court by the chairman of the Douglas County Democratic Central Committee and by the Student Senate of the University of Kansas objecting to the districts as now apportioned. The objections were not on the basis of population variance. The charge is made that the reapportionment of Districts 44 and 46 is the result of political gerrymandering designed to split the student vote at the University of Kansas. It is alleged that three precincts form a cohesive and homogeneous unit. These were split so that two of the precincts were placed in the new District 46 and only one was left in District 44. It is argued that this division of the student vote at the University of Kansas resulted in invidious discrimination.

No cases were cited by the parties but this court has found one case which holds that discrimination against college students may be equated with discrimination on the basis of age under the Twenty-Sixth Amendment to the United States Constitution. This provision of the constitution provides that the rights of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by any state on account of age. *Walgren v. Howes,* 482 F.2d 95 (1st Cir. 1973), *on remand* 373 F. Supp. 624 (D. Mass. 1974), *aff'd* 519 F.2d 1364 (1st Cir. 1975).

The argument in the present case is made that there are presently 22,228 students enrolled in the University of Kansas. It is stated a large portion of the students hold similar political beliefs and those living in precincts identified as "L", "K", and "O" form a cohesive homogeneous unit that cannot be separated without discrimination. From census figures covering these three precincts, furnished to this court by one of the attorneys for the Douglas County Democratic Central Committee, it appears that in 1978 there were 5,138 "census persons" residing in these three precincts, and 3,156 voters were registered on October 27, 1978. Even assuming that all registered voters in these three precincts

were students, which is highly questionable, the three precincts involved would represent no more than 14.2% of the students in the university.

Other factors militate against a solid cohesive student body. The students come from different family and political backgrounds and from different localities. Many students vote in their home districts. It is extremely doubtful that all would be of one party. Considering modern trends in higher education each student is trained for independent thinking. Unanimity among a student body seems unlikely. Keeping all these factors in mind we cannot say that removing precincts K and O from District 44 and placing them in the newly constituted District 46 was done for the purpose of cancelling the voting strength of the 22,228 students attending the University of Kansas. We are not convinced that invidious discrimination resulted.

During the public hearing afforded by the court the Chairman of the Democratic Central Committee for Douglas County furnished this court with a map showing the political profile of the various precincts and wards in the city of Lawrence. Assuming the political profile indicated on the map is true it appears that District 44 has a somewhat different political profile after the present reapportionment. It was formerly in the solid Democratic ranks. Now, after the district was moved west in the city the political profile of the district has changed to a slight Republican majority. However, the area was made up in large part from areas formerly in District 45, and District 45 is presently represented by Mr. John M. Solbach, a member of the Democratic Party. It is difficult if not impossible to consider political profiles in apportionment cases for the profiles depend in large part on voting patterns which change with the personalities of the candidates.

A question has been raised because of changes in district boundaries which occurred on the floor of the house as a result of an amendment offered by Representative John H. Vogel. He represents District 43. Representative Vogel is a member of the Republican Party. No change in the boundaries of District 43 occurred on the floor of the house. Representative Vogel was not personally benefited by the Vogel amendment.

The deviations in population of the Douglas County districts from the ideal population (18,874) as constituted by the House committee were:

| District | Population | Deviation |
|:---:|:---:|:---:|
| 43 | 19,089 | + 1.1 |
| 44 | 19,410 | + 2.8 |
| 45 | 19,073 | + 1.1 |
| 46 | 18,021 | - 4.5 |

The deviations after the Vogel floor amendment were:

| District | Population | Deviation |
|:---:|:---:|:---:|
| 43 | 19,089 | + 1.10 |
| 44 | 19,439 | + 2.95 |
| 45 | 18,132 | - 3.90 |
| 46 | 18,933 | - 0.31 |

If as indicated at the hearing there is growth and expansion into areas west and southwest of the city of Lawrence, it would appear that the change in the population of District 45 from a plus 1.1 deviation to minus 3.90 deviation was justified. We note a further lessening of the amount of deviation in District 46 which was effected by the Vogel amendment. The deviation went from a minus 4.5 to a minus 0.31 in that district. This was a change which lessened deviation and would seem to have been justified.

We do not overlook political considerations brought to our attention, although such allegations are merely allegations at the present time. Time alone will tell whether the fears of the Democratic Central Committee are valid, and whether a Republican representative will replace one of the two Democratic representatives serving this area. At this time it appears speculative at best and is not a proper basis upon which to find invidious discrimination.

In *Gaffney v. Cummings,* 412 U.S. 735, 753, 37 L.Ed.2d 298, 93 S.Ct. 2321 (1973), it is said:

"Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. . . . Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences."

We have made a careful examination of the complaints which have been lodged against the present plan of reapportionment. It

is not a perfect plan. No district apportionment plan ever is. However, the attorney general in his petition to this court points out:

"The minimum population required to elect a majority of representatives is determined by adding the population of the 62 least populated districts and 51 percent of the population in the sixty-third smallest district. This results in a figure of 1,154,716 people. This means that 48.9 percent of the population of Kansas is required to elect a majority of Kansas representatives. This figure suggests that House Bill 2620 reflects the one man - one vote concept."

State reapportionment of legislative districts is the task of local legislatures or of those organs of state government selected to perform it; their work should not be invalidated under the equal protection clause of the Fourteenth Amendment when only minor population variations among districts are shown, unless there appears some compelling reason. *Gaffney v. Cummings,* 412 U.S. at 751.

As pointed out in the recent case approving the 1979 apportionment of the senate, a reapportionment act of the legislature to be valid must be procedurally valid as well as satisfy constitutional requirements. The attorney general has set forth a step by step analysis of the procedure which House Bill No. 2620 followed in arriving on the governor's desk. The procedural steps need not be iterated in this opinion. We have examined them. All necessary procedural steps were taken. The act was approved by both the house and the senate and it was approved by Governor John Carlin on March 16, 1979.

Our examination of the representative districts as constituted under House Bill No. 2620 has been completed in accordance with the directions of Article 10, Section 1 of the Kansas Constitution. There appears to be substantial equality of population among the 125 districts and equal representation for equal numbers of people should result. We have discovered no invidious discrimination against any group of the state's citizens which would impermissibly impair their constitutionally protected right to vote. All districts as constituted are reasonably contiguous and compact except in those instances mentioned where a satisfactory explanation based upon a rational state policy has been noted. The integrity of the political subdivisions of the state has been preserved in arriving at the district boundaries. Although it was held in *In re Senate Bill No. 220,* 225 Kan. at 633, that Article 10, Section 1(*a*) permits separate considera-

tion of bills reapportioning the house of representatives and the senate, in the present case we have considered both acts and have reexamined the apportionment of senatorial districts in Senate Bill No. 220. We here affirm the validity of both legislative acts.

Judgment is entered upholding the validity of 1979 House Bill No. 2620 as it apportions the representative districts of Kansas.