Eric WALGREN et al., Plaintiffs,

v.

BOARD OF SELECTMEN OF the TOWN
OF AMHERST, MASS., Defendants.

Civ. A. No. 73–109–G.

United States District Court,
D. Massachusetts.

March 22, 1974.

Eric Walgren, pro se, Thomas Lesser, Conway, Mass., for plaintiffs.

H. Theodore Cohen, Tyler & Reynolds, Donald W. Suchma, David M. Roseman, Boston, Mass., for defendants.

## OPINION

GARRITY, District Judge.

This is a civil rights action pursuant to 42 U.S.C. § 1983 involving the fixing of the dates for a primary election in January 1973 in the Town of Amherst, and the notice of election provided town residents generally, but especially to students, by the defendants. The plaintiffs originally challenged the manner in which the election was held as violative of state law, but they have now abandoned that challenge. Plaintiff Walgren is a thirty-four year old resident of the Town of Amherst who sought a seat on the Board of Selectmen, but lost, in the contested primary election. Mr. Walgren, a colorful and self-described radical, anticipated wide student support in the election. The plaintiffs Sherman and Glusco are students at colleges within the Town of Amherst who are residents thereof. The defendants Howes, Bouchard, Eddy, Sullivan and Garvey comprise the Board of Selectmen of the town. The court initially dismissed the complaint for failure to state a claim, but on appeal the Court of Appeals reversed and remanded for trial. Walgren v. Howes, 1 Cir. 1973, 482 F.2d 95.

The plaintiffs, after several amendments, have alleged essentially two federal causes of action. First, it is claimed that the election calendar established by the defendants is unconstitutional under the Fourteenth and Twenty-sixth Amendments[1] to the Constitution of the United States because of the effects of those dates upon students as a class and upon plaintiff Walgren. Second, the plaintiffs assert that the notice provided by the town officials was unconstitutionally deficient under the Due Process Clause of the Fourteenth Amendment. A third, pendent state cause of action alleging that the notice violated § 2 of the Caucus Act, 1955 Mass. Acts of the Legislature, Chapter 149, as amended, we dismiss as a matter of discretion under United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, because a state court should pass initially upon the requirements of notice in a complex state election statute and because the disputed election has already been held.

Pursuant to Rule 23(b)(2), Fed.R. Civ.P., the court certified a plaintiff class composed of the students, faculty and staffs of the three colleges in the Town of Amherst. Because of plaintiffs' contentions based upon the Twenty-sixth Amendment, an effort is made in this opinion to define a subclass comprising student voters 18–20 years old. At the trial, no evidence was offered concerning the numbers or circumstances of faculty and staff.

While many witnesses were heard and exhibits received at the trial without jury, it developed that few material facts were contested and there was simply no evidence to establish alleged facts that were contested. The actual issue between the parties has been the characterization to be ascribed to the events and acts of the parties and the legal consequences, if any, flowing from that characterization.

### Findings of Fact

1. The town of Amherst, located in western Massachusetts, has a non-student population of 15,000–16,000. Within its borders lie the University of Massachusetts, Amherst College and Hampshire College. Amherst utilizes a repre-

---

1. The Twenty-sixth Amendment was ratified on July 5, 1971 and provides, "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Plain-

tiff Walgren also claimed a violation of his First Amendment rights, but did not adduce a scintilla of evidence in support of it at the trial; and we shall not discuss that claim further.

sentative town meeting form of government, with a board of selectmen and a town manager. At the time of the instant controversy there were approximately 11,400 registered voters in the town, of whom 1587 resided in University of Massachusetts dormitories, 23 in fraternities or sororities, and 108 in University-owned apartments. Students not commuting from their homes are required to live on campus unless they are twenty-one years old, seniors, or married. Because of this the large majority of students residing in dormitories are 18–20 years old. An unknown number of university students who were registered to vote in Amherst lived off campus in apartments. There were 88 students registered to vote in Amherst living in Amherst College dormitories and 127 in Hampshire College dormitories. The voter potential at all these schools is substantially greater. The University has approximately 16,000 undergraduate and 6,000 graduate students in attendance, Amherst College 1270 students and Hampshire College 1000. However, the number of students actually registered represents a large block of roughly 3,000 voters within the town.

2. At its November 27, 1972 meeting, the board of selectmen voted a 1973 election schedule as follows:

| | |
|---|---|
| December 8, 1972 | deadline for publishing notice of filing date |
| December 15 | deadline for incumbents to file |
| December 28 | deadline to file for certification for town offices |
| January 2, 1973 | caucus call, if necessary |
| January 15 | deadline to file for certification for town meeting members |
| January 19 | the caucus, if necessary |
| February 20 | town election |
| March 12 | annual town meeting |

The same formula, with only a shift from the first to the second week in March for the town meeting, has been used since 1929. The election schedule has not undergone any changes which coincided with the grant of the vote to eighteen-year-olds, nor with any increase in the number of students in the town. The "caucus" is another term for a primary election. It is held only if more than two candidates file nomination papers for the same office in the town's nonpartisan general election. It cannot be known whether a caucus will be necessary until the deadline for filing nomination papers.

3. The controversy over the election calendar began with a telephone call by Mr. Walgren to Selectman Howes on the eve of the December 11, 1972 board of selectmen's meeting. Mr. Walgren spoke with Mr. Howes concerning his strong feeling that the announced election calendar discriminated against students. Mr. Howes agreed to place the question on the agenda for the December 11th meeting despite the fact that the deadline for doing so had been the previous Friday. He also agreed to let Mr. Walgren address the board of selectmen on the question.

4. As a result of Mr. Walgren's plea for a new calendar, the selectmen voted on December 11 to reconsider the election calendar and to take further action on December 18, 1972, the next meeting of the board of selectmen. The December 11 meeting was not attended by townspeople other than the officials normally present and Mr. Walgren. It did,

however, get substantial press coverage. At that meeting the selectmen voted to go on record as desiring to change the date of the elections to be held when the University was in session. As a result of this vote and the press coverage, the selectmen all received a number of phone calls relative to the changing of the election calendar. The callers were about evenly divided between supporters and opponents of the change.

5. Plaintiffs endeavored to establish at trial that the selectmen came under intense pressure, to which they acceded, not to "knuckle under" to Mr. Walgren and to keep students out of the town's political process. The only evidence of this was news stories suggesting such pressure. Those stories were directly contradicted by each selectman under oath. Additionally, Mr. Newman, a reporter for the Daily Hampshire Gazette, a county newspaper, confirmed that testimony. Mr. Newman regularly covers Amherst political stories, was present at the relevant meetings and spoke to each selectman concerning the calendar controversy. His testimony was to the effect that he was unaware of any basis for the knuckling-under stories or for a belief that the selectmen's actions were intended to discourage student participation.

6. The December 18 meeting was attended by approximately fifty townspeople. The atmosphere surrounding the question of the election calendar became one of "dynamic confusion", a term used by Selectman Garvey during his testimony. The meeting ran long into the night. A variety of opinions were expressed: Mr. Walgren's plea not to burden the students' vote, Mr. Garvey's opposition to affording any group specialized treatment, and an assertion by a woman in the audience that students had no business meddling in town affairs. The board then voted 3 to 1 to establish a new election calendar and rescind the calendar attacked by plaintiffs.

7. At this point, policy having been determined, the board turned to the practicalities of selecting a new calendar with specific dates. It soon became apparent that while the policy questions behind a change in the election calendar had been considered, no one had attempted to designate specific new dates within the formula required by state statute. Once a tentative election schedule had been proposed, the debate centered upon the number of days required by law to fall between the caucus and the general election and the problem of selecting dates which would not discriminate against any of the three schools within the town, since each had a different schedule. After considering many dates Mr. Bouchard concluded that as a practical matter an accommodation of the students was not possible. Announcing his intention to reverse his vote, he moved to readopt the original calendar. After another plea by Mr. Walgren to facilitate student voting, that motion was rejected—Mr. Bouchard voting against his own motion.

8. Eventually, as proposed by Mr. Walgren, it was voted that the dates for the caucus and the final election be postponed for ten days, to January 29 and March 1 respectively; the date for the town meeting remained unchanged. However, the selectmen were concerned that the 31 days required by statute might not exist between January 29 and March 1. With this in mind the board voted to adopt the proposed calendar conditionally upon its legality being approved by a leading local attorney, Mr. Dakin, by noon on the next day. This deadline reflected the opinion of the board that notice, by statute, would have to be published by December 19 if the new schedule were to be implemented. If in counsel's opinion the new calendar were illegal, an emergency meeting was scheduled for 6:00 P.M. on December 19.

9. The selectmen's fears were fulfilled. Mr. Dakin advised the board in writing that in his opinion the new calendar was not legal since there were not the requisite 31 days intervening between the date of the caucus and the date of the general election. Therefore

the board met again at 6:00 P.M. on December 19. Mr. Dakin did not attend, but through the town manager, Mr. Torrey, suggested that the illegality could be cured by further postponing the election until March 5 and postponing the annual town meeting until March 19. This was the first proposal that the date of the town meeting be changed. The board voted unanimously to rescind its action of the day before and reinstate the original election calendar which had been voted on November 27.[2]

10. There were several reasons for reinstating the original calendar. One was to counteract voter confusion caused by an erroneous press release that the "Dakin" dates had been approved. Another was the defendants' belief that an immediate, final decision was required to meet a publication deadline in the Amherst Record newspaper. Also, the town's fiscal year had begun on January 1 and scheduling the town meeting as soon as possible after preparation and distribution of the town report showing receipts and expenditures for the previous year served to minimize the pressure on town meeting members to ratify expenditures already incurred for the current fiscal year. Furthermore, several prospective members had indicated to selectmen that, in reliance on the customary date of the town meeting, they had made plans which would conflict with a later date. There is no procedure for voting by proxy or absentee ballot at the town meeting.

11. At the December 28, 1972 meeting of the Board of Selectmen Mr. Walgren renewed his plea for a change in the election dates. Failing on this request, he assailed the notice to be given of the election calendar in three respects: (a) the town had not purchased advertising space in the newspapers but had relied upon a news release; (b) the dates provided were not complete; and (c) the term "caucus", because of its local meaning, should have been defined.

Mr. Walgren's contentions were not acted upon.

12. Before, during and after the election in question, the defendant selectmen acted in good faith toward Mr. Walgren individually and student voters generally. They heard Mr. Walgren fully and repeatedly. They took positive steps to encourage student voting. During the fall of 1971 and in the spring and fall of 1972 the selectmen sent mobile voter registration units to various campuses for the purpose of registering students. As a result of four visits to the campus of the University of Massachusetts, 1,798 students were registered. The selectmen also provided a seat for a student on at least one major town committee. In December 1973, the selectmen established the 1974 election calendar so that the caucus is held on March 5, a date agreed to by Mr. Walgren and the student government groups at the University of Massachusetts, Amherst College and Hampshire College. While trial was in progress the selectmen unanimously adopted a declaration of policy "to hold municipal elections on dates that afford all registered voters an opportunity to personally participate therein by casting ballots at the polls."

13. Printed notices of the caucus were posted in seven places within the town. The format, "Greetings . . ." makes the notice more traditional than functional. No notices were posted on any of the college campuses. No announcement was printed by the selectmen in any of the college newspapers, although several appeared in other local newspapers, including the Daily Hampshire Gazette and the Amherst Record. The election did receive extensive newspaper coverage, partly because of Mr. Walgren's candidacy and the changes he requested. The student radio at the University urged students to vote.

14. The result of the balloting on January 19 was Howes 1353; Schuerer

---

2. The legal opinions under which the selectmen were operating may have been erroneous; however, at no relevant time were the selectmen aware of this.

413; Walgren 217; Costegan 66; and Patterson 53. Schuerer was a graduate student at the University of Massachusetts with a liberal reputation; at the selectmen's meeting on December 18 Schuerer as well as Walgren spoke in favor of changes to enhance the student franchise. Exhibits were received in evidence listing the name and home address of every undergraduate student residing in a University dormitory who was registered to vote in elections held during 1972 and 1973; and indicating which students voted, and whether in person or by absentee ballot, in the caucus and final election in 1973. The figures for the election at issue and the presidential election on November 7, 1972 and the town election on February 20, 1973 were as follows:

|  | Total Registered | Voted in Person | Voted Absentee |
|---|---|---|---|
| Presidential Election 11/7/72 | 1491 | 1284 | 43 |
| Town caucus 1/19/73 | 1587 | 26 | 1 |
| Town election 2/20/73 | 1587 | 142 | 4 |

Of the 1,587 students registered to vote in 1973, defense counsel counted the number giving home addresses in states other than Massachusetts and represented that it was 156, or slightly less than 10%.

15. The absentee ballot process, which was made applicable to primary elections in Massachusetts in 1971,[3] requires a written application for such a ballot. An absentee ballot is available to any voter who for any reason will be unable to vote in person at the polling place. Mass.G.L. c. 54, § 86. In response to a request for an absentee ballot, a package containing the ballot, instructions and a return envelope is mailed to the voter. He must fill in the ballot, have the package notarized (with the payment of the normal notary fee) and mail it back to the town clerk. To be counted, the ballots must be received before the polls close on election day. Persons who learn, when too late to use the mails for the absentee ballot process, that they will be unable to attend at the polls may vote in person at the town clerk's office, after completing an application, up until noon of the day before the election.

16. Defendants' eventual rejection of plaintiffs' proposal that the caucus date be shifted from January 19 to 29 was of no consequence to students absent from Hampshire College where standard classes did not resume until February 5. At Amherst College, standard classes begin again on January 29. Thus any student voters away on January 19 could have voted in person if the date had been changed to January 29. However, they would have had no greater opportunity to participate in any pre-election activities. The University of Massachusetts had registration for the second semester from January 22 to 24 and regular classes resumed on January 25, so that student voters absent on January 19 could have gone to the polls in person if the change had been made and could have participated in up to one week's pre-election activities, had there been any.

17. The campuses of the three colleges in Amherst were by no means deserted during January 1973 or on January 19, the date of the caucus. Unlike previous years when January was a vacation period, all three schools remained open for special, short courses for which credits were given and for independent

3. A few states, e. g., New York, make no provision for voting by absentee ballot in primary elections.

study and for other purposes during January 1973. Amherst College and Hampshire College were conducting so-called January terms and at least half of their students stayed on campus during January. Regarding student voters at those schools, so far as indicated by the evidence all of them may have been in town on January 19, or none of them. At the University of Massachusetts some dormitories were kept open not only for students pursuing independent study but also, if permission was sought, for students from distant homes or who had local employment or other legitimate reasons for remaining on campus. For example, plaintiff Sherman remained on campus because of employment. Students who wished to return to campus to vote would have been allowed to stay overnight. Students living in fraternities, sororities, rooming houses and apartments off campus, totalling roughly 10,000, could of course remain without permission.[4]

18. The number of students remaining in the University dormitories during January may be inferred from testimony given by assistant dean of students West as to numbers remaining in certain parts of the campus, which ran an average of about 5%. Thus of the 10,657 students in University dormitories, about 530 remained. It has previously been noted that there were 1,587 dormitory residents registered to vote in 1973, of whom 763 registered during a campus registration drive on September 12, 1972. Even if all 530 who remained were voters, about 1,050 voters were away during January. More realistically, in view of the low percentage of students registered to vote in Amherst, probably less than half the 530 students who remained were Amherst voters, say 250, making the total of those away 1,300. How many of the 1,300 were age 18, 19 or 20 involves considerable guess-work. Making allowance for dormitory residents who were 21 or over when they

registered to vote, or reached 21 thereafter, and the large number of registrations in September 1972, we estimate the number of 18–20 year old voters away from school on January 19, 1973 at 1,000.

## Conclusions of Law

█ The importance of the right to vote is not debatable. See Yick Wo v. Hopkins, 1886, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220. It is obviously of the essence in a democracy and an alleged infringement of that interest should evoke a careful consideration by a court. The vote, however, cannot be considered—wholly abstractly—superior to all other interests. Interests such as free speech and the rule of law also play crucial roles in our democracy. Nor should the invocation of an alleged infringement of voting rights blindly lead to the obliteration of all other interests which may impinge thereon, regardless of how speculative or incidental that infringement might be.

We note at the outset of our analysis that this case does not present an attack upon a statute, which would have a continuing and repetitive application. Nor does this suit challenge an administrative determination. Rather, at issue is a hybrid determination by the board of selectmen of Amherst. The nature of that body and the manner in which it arrived at its decisions can aptly be described as legislative; however, the nature of the question decided and its limited prospective effect—only the election calendar for 1973 was set—imbued that action with many of the characteristics of an administrative decision. These facts bear upon our evaluation of the validity of the selectmen's action in the context of at least some of the theories upon which the 1973 election dates are challenged. Cf. Williams v. Rhodes, 1968, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24. This is not to say that they are dis-

---

4. The only evidence as to these categories came from the president of the student body, Apostola, who estimated that 60% of

occupants of private apartments remained in January.

positive, for if the selectmen's actions worked an unconstitutional end or effect, then the election dates chosen would nevertheless be impermissible. Cf. Dunn v. Blumstein, 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.

■ The plaintiffs' first argument is that defendants' retention in December 1972 of the 1973 election calendar first adopted in November 1972 violated the Equal Protection Clause of the Fourteenth Amendment. Plaintiff Walgren claims that the defendants discriminated against college students intentionally and in bad faith. Plaintiff Sherman has disavowed any reliance on intent, and indeed denies the validity of intent or motive as part of the constitutional determination.[5] Since we have found that the defendant selectmen acted in good faith and did not discriminate invidiously against students, the only determination to be made under the Equal Protection Clause is the effect of the 1973 election calendar: did it discriminate unconstitutionally against students?

The effects to be scrutinized are the burdens placed upon voting in the caucus election.[6] The Court of Appeals has indicated that, at least with respect to voting itself, strict scrutiny is inappropriate and the approach of Rosario v. Rockefeller, 1973, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1, should be followed. Walgren v. Howes, 1 Cir. 1973, 482 F.2d 95, 99. Our first inquiry is whether the burden imposed by the election schedule was "so severe as itself to constitute an unconstitutionally onerous burden." 410 U.S. at 760, 93 S.Ct. at 1251; Walgren v. Howes, *supra*, 482 F.2d, at 100. A

brief review of the burdens which have been upheld by the Supreme Court against equal protection challenges clearly shows that the plaintiffs' claim of disenfranchisement here is not nearly of the order of those that have been struck down by the Supreme Court. It is less, even, than some that have been sustained. In Rosario v. Rockefeller itself the Court sustained a requirement that voters register eight months before a presidential primary and eleven months before a nonpresidential primary to vote in that primary. The rationale for this requirement was the prevention of "raiding" by one political party in the primary election of another party. The Court found this a sufficient legitimate purpose without quarreling with the Second Circuit's conclusion that raiding was not a particularly realistic concern. 458 F.2d 649 at 653.

Cases which have invalidated burdens on voting have usually involved a total denial of the vote to a particular class by law or in fact. *Rosario, supra* 410 U.S. at 756, 93 S.Ct. 1245. See, e. g., O'Brien v. Skinner, 414 U.S. 524, 94 S. Ct. 740, 38 L.Ed.2d 702 (1974); Bullock v. Carter, 1972, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92. Williams v. Rhodes, 1968, 393 U.S. 23, 25, 89 S.Ct. 5, 21 L.Ed.2d 24; Carrington v. Rash, 1964, 380 U.S. 89, 94, 85 S.Ct. 775, 13 L.Ed.2d 675. In only one case has the Court invalidated a restriction viewed as nonabsolute: in Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), plaintiffs challenged an Illinois statute which prohibited any person from voting in the primary of one political party if that voter had cast a ballot in the primary election of another political party within the pre-

---

5. It is too late to urge that motive or intent cannot be the foundation for a finding of unconstitutionality. Keyes v. School District No. 1, 1973, 413 U.S. 189, 201, 205, 208, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548.

6. Theoretically plaintiffs also argued that the calendar deprived them of the opportunity to participate in pre-election campaigning and education. As a practical matter, however, considering that the vast majority of students would be away during the traditional holiday break between Christmas and New Year's Day and the dates proposed by Mr. Walgren would have added only a few days for pre-election activities, this aspect of plaintiffs' claim is *de minimis*. Moreover, plaintiffs offered virtually no evidence at the trial of any pre-election activity.

ceding 23 months. This statute was struck down by the Supreme Court, but principally because it constituted a substantial restriction on political party affiliation.

In the instant case the burden on student voting not only fell short of the quantum which the Supreme Court has forbidden but also of the allegations of plaintiffs that they were "deprived of the opportunity to visit personally the polls", upon which the Court of Appeals relied. Walgren v. Howes, *supra*, 482 F.2d, at 99. Students were not required to vote by absentee ballot. They could have remained on campus for independent study or other legitimate purposes, including participation in a political campaign. Had they wished to be away for most of the month of January, they would have been permitted to return for one or two nights in order to visit the polls personally. Being a state university, the University of Massachusetts draws a large majority of its students from within the Commonwealth. According to defense counsel's representation, registered voters living in University dormitories included less than 10% whose home addresses were outside Massachusetts. The exhibit containing this information also showed large numbers of students coming from cities and towns within an hour's automobile ride of Amherst. Probably many of such students could have voted in person had they wished, without much expense or inconvenience. Students using absentee ballots encountered no more difficulty than other voters in Amherst or in other Massachusetts communities. They were readily available either by mail or, until the very day before the voting, at the office of the Town Clerk. Students were in no more burdened a situation than the serviceman away on military duty, the businessman away on a business trip or the shut-in confined to his home on account of illness.

The next question to be answered is whether the election calendar was "arbitrary . . . unconnected to any important state goal." Walgren v. Howes, *supra*, at 100. The answer is negative. Theoretically the defendants could have scheduled the local election anytime during the year without violating state law. Practically, it is highly desirable to schedule the town meeting as early as possible during the fiscal year consistently with members having before them the financial history of the previous year. Throughout the Commonwealth town meeting time in communities whose fiscal year starts on January 1 usually coincides with the appearance of the crocuses. Another important governmental goal of the selectmen in this case was maximization of attendance at the town meeting, several of whose members had, in reliance upon the customary date of the second Monday in March, made plans to be away on the date proposed by Mr. Walgren. A third proper consideration was minimization of voter and candidate confusion. The original election dates and filing deadlines were announced in early December. Then, just before the December 19 meeting, the town manager Torrey released a second set of dates, the so-called "Dakin" dates proposed by Attorney Dakin, on the erroneous assumption that they would be approved by the selectmen. When the meeting convened at 6:00 P. M. on December 19, the defendants believed that the deadline for publication of notice was only hours away. When it developed that the "Walgren" dates were thought by counsel to be illegal and that the "Dakin" dates conflicted with the governmental goals heretofore described, the selectmen were faced with the alternative of endeavoring to agree upon a third set of dates, thereby compounding rampant confusion and perhaps subjecting themselves to ridicule, or reinstating the dates initially publicized. They chose the latter course. In our opinion it was not arbitrary.

Plaintiffs' alternative theory attacking the 1973 calendar is that it violated the Twenty-sixth Amendment, a theory discussed by the Court of Appeals in Walgren v. Howes, *supra,* on the basis of plaintiffs' allegations, some of which

were not established at the trial. Noting that the young voters' franchise under the Twenty-sixth Amendment was analogous to the black franchise under the Fifteenth, the Court of Appeals suggested that we pursue an analysis similar to that used under the Fifteenth. The court's opinion described the dual purpose of the Twenty-sixth Amendment of eliminating the "administrative nightmare" of separate voter lists for national and local elections and bringing 18, 19 and 20-year-old persons into the political process. Walgren v. Howes, *supra*, at 100–101. The court, however, also pointed out that decisional analysis under the Fifteenth Amendment has been neither consistent nor explicit, compare Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, with Hadnott v. Amos, 1969, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336, and Lassiter v. Northampton County Board of Elections, 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed. 2d 1072, and stated its preference to leave resolution of plaintiffs' claim, in the first instance, to the district court. Subject to these qualifications, the Court of Appeals stated the following standard, " . . . if a condition, not insignificant, disproportionately affects the voting rights of citizens specially protected by a constitutional amendment, the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective." Walgren v. Howes, *supra*, 482 F.2d, at 102.

Before applying the test proposed by the Court of Appeals, we accept its invitation to set forth some thoughts of our own. Whether the Twenty-sixth Amendment should be construed as imposing constitutional prohibitions analogous to those surrounding racial restrictions under the Fourteenth and Fifteenth Amendments is not an easy question. Moreover there are differences between obstructing access to the political process and the placing of burdens on the exercise of voting rights. The students in the town of Amherst were not denied access to the political process within the town. Obviously a gross burden on the exercise of the franchise could have as preclusive an effect as a bar to participation in the franchise. But that is clearly not the nature of the burden in this case.

The vast majority of seniors at any four-year college and virtually all graduate students (at the University of Massachusetts approximately 6,000) are age twenty-one or over. If an election date coincides with a school recess so as to place burdens on student voters in the exercise of the franchise, those burdens fall equally on all students (as well as on faculty and staff who plan to be away during the recess). If a student who is eighteen can claim greater freedom from those burdens than a student who is twenty-one, only the fortuitous accident of birth supports any difference in treatment. Thus while students may make up a substantial portion of the class of eighteen to twenty-year old voters, when all students are similarly disadvantaged it is questionable whether one portion of those students should be treated differently than another portion. Granted, college students as distinguished from other beneficiaries of the Twenty-sixth Amendment had a major impact on its enactment and ratification; but can that impact or any other consideration justify one student being treated differently than another? The class of voters burdened by the election calendar shares but one common trait—their association with the schools in question. It would seem that this burden presents the classical equal protection problem vis-a-vis other residents of the town and would be most appropriately decided under that provision of the Fourteenth Amendment. Cf. Carrington v. Rash, 1965, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (invalidation of voting discrimination against servicemen stationed in Texas).

■ Furthermore, we view the protection afforded students under the Twenty-sixth Amendment as fundamen-

tally different than the protection afforded under the Thirteenth, Fourteenth and Fifteenth Amendments. The Civil War Amendments have become powerful weapons for the vindication of civil rights in our courts. That protection is most pervasive when the treatment of citizens is discrimination on the basis of race or other "invidious" classifications. See, e. g., Loving v. Virginia, 1967, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010; Harper v. Virginia Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169. The nature of the judgments represented by the Civil War Amendments and the Twenty-sixth Amendment are fundamentally different. The decision that a man should not be discriminated against because he is black [7] rests upon a far more fundamental value perception than the decision to bring 18, 19 and 20-year-olds within the political process. This type of value perception accounts for the heightened judicial protection afforded when racial discrimination or a total abridgement of the right to vote is at issue. Regardless of how sympathetic one is to the extension of the vote to young people, the nature of the decision involved is simply not of the same kind. Moreover the extension of the ballot to young people does not have a historical background such as slavery, nor does it rectify a wrong which was as inconsistent with our constitutional scheme as the total denial of the vote of an otherwise qualified citizen on account of his race or poverty. See Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 94, 6 L.Ed. 23; see generally V. O. Key, Jr., Southern Politics (1949). For these reasons we have difficulty in conceiving that a burden on the exercise of the ballot would be invalid under the Twenty-sixth Amendment when it would not be similarly invalid under the Fourteenth.

The Twenty-sixth Amendment did not correct a wrong of the order of those remedied by the Civil War Amendments or by the Nineteenth Amendment, which enfranchised women. The latter amendment was also referred to in the *Walgren* opinion, 482 F.2d, at 101. While the treatment of women in denying them the ballot was not hateful as was the treatment of blacks, it was similarly unenlightened and often degrading. The Twenty-sixth Amendment was less a recognition of basic human rights than of a change in the condition of young Americans who generally were marrying earlier, travelling more widely and taking a greater interest in government than ever before. In one sense it was an official acknowledgement of the new maturity, sophistication and responsibility of the T.V. generation.

◼ Turning to the issues framed by the Court of Appeals, viz., (a) whether the inconvenience to students deciding to be away from Amherst during January 1973 of either using the absentee ballot or returning to vote amounted to a not insignificant burden on their right to vote, and (b) whether any such burden disproportionately affected the voting rights of young voters 18–20 years old, our description *ante* of the nature of the plaintiffs' inconvenience and defendants' countervailing goals is equally applicable here. The crucial consideration now seems to be the difference between an "onerous burden", under Rosario v. Rockefeller, *supra*, 410 U.S., at 760, 93 S.Ct. 1245, and Jenness v. Fortson, 1971, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554, and a "not insignificant" one. This question should not be decided in the abstract but in the factual context presented. In the light of pronouncements by the Supreme Court under the Fifteenth Amendment, e. g., Hadnott v. Amos, *supra*, and Lassiter v. Northampton County Board of Elections, *supra*, we believe that the burdens here at issue were insignificant in a constitutional sense.

---

7. While it is difficult to characterize this decision as anything other than a moral one, the human debasement involved in racial discrimination is obvious. See Karst, Invidious Discrimination: Justice Douglas and the Return of the Natural Law-Due Process Formula, 16 U.C.L.A.L.Rev. 716 (1969).

If the burdens in question were not insignificant, the next question would be whether such burdens disproportionately affected the voting rights of young voters in Amherst 18–20 years of age. This inquiry would involve speculation as to the groups to be compared. There was no evidence of the size of various groups within the 18–20 age group who may not have been similarly burdened: the number of 18–20 year old residents of Amherst who were registered to vote but lived elsewhere than in the University dormitories, University student voters under age 21 and living off campus, young voters at Amherst College and Hampshire College, and young people registered to vote in Amherst attending high school, out-of-town colleges or no school at all, such as youths obtaining employment immediately on graduation from high school. An estimate by way of speculation would be the only basis for a determination of the number of voters over age 20 burdened to the same extent as the subclass of approximately 1,000 student voters residing in the University dormitories who were burdened. Adults in this category would include faculty and staff out of town during January and local adult residents away from their homes for reasons of business, military service, health and perhaps pleasure. We do know that the presumably burdened class of approximately 1,000 young voters comprised slightly less than 10% of the total electorate of 11,400. Whether this circumstance is relevant, or the circumstance of less than 20% of the eligible voters in Amherst having voted in the caucus of January 19, or the very small percentage of University dormitory students voting in the caucus and subsequent general election, we are not sure.[8] We do believe, however, that the ascertainment of relevant ratios and proportions as to relative burden is too conjectural to support plaintiffs' claim, especially in view of the doubts we have expressed as to the significance of the burdens at issue, i. e., the first of the two-pronged test formulated by the Court of Appeals. It is well settled that resolution of constitutional issues should not be undertaken on the basis of speculation. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). We believe that the instant case is similar to San Antonio v. Rodriguez, 1973, 411 U.S. 1, 19, 93 S.Ct. 1278, 36 L.Ed.2d 16, in that the "threshold considerations of analysis" are missing.[9] Therefore we conclude that plaintiffs have also failed to support the second phase of their argument based upon the Twenty-sixth Amendment.

Plaintiffs' second cause of action asserts that the notice of the election given by the Town of Amherst was constitutionally deficient under the due process clause of the Fourteenth Amendment. We are aware of no cases which require notice of elections as a matter of constitutional law. There are state cases dealing with the failure of officials to comply strictly with statutory requirements for election notices. Nonetheless, in view of the importance of the right to vote, it would be inconceivable that the Constitution would not require reasonable notice. Certainly in a democracy a loss of the opportunity to vote because of lack of notice would be the loss of an important liberty "preservative of other basic civil and political rights." Reynolds v. Sims, 1964, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506; Yick Wo v. Hopkins, *supra*, 118 U.S., at 370, 6 S.Ct. 1064. We therefore assume

---

8. E. g. the question of a disproportionate burden on student voters may have become academic in February 1973 when only 142 students out of 1,587 registered voters in the University dormitories voted in the general election which was held when the University was in full operation. We wonder how one can burden a person's participation in conduct in which he is not participating.

9. The Court's opinion in the *San Antonio* case, 411 U.S., at 28, 93 S.Ct. 1278, is also relevant to our reliance *ante* on the difference in the historical backgrounds between the Fifteenth and Nineteenth Amendments on the one hand and the Twenty-sixth on the other.

that the Constitution requires that reasonable notice of elections be given. The right to vote is at least as important as other rights where notice has been required prior to governmental action significantly affecting those rights. See, e. g., Fuentes v. Shevin, 1972, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; Goldberg v. Kelly, 1970, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; Sniadach v. Family Finance Corp., 1969, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349. But on the facts here presented we cannot conclude that the notices which were posted and published were constitutionally insufficient.

Plaintiffs did not show that the dates, times and polling places for the election were not generally known by the residents of Amherst, including student voters. Students were able to locate the voting booths in November 1972 when nearly 90% of the voters living in University dormitories cast ballots in the presidential election; and there was no indication that the location of the polls was changed in the interim, or notice provided in any different manner. If they lacked that knowledge it was readily available without requiring a major effort or expense. There was no effort to hide the fact that there would be an election, nor was it likely that the notice provided failed to give voters actual notice. Unlike a lawsuit where service in hand or by mail may be necessary to give reasonable notice, elections generate publicity and public awareness, and did so in this case. We conclude that the notice given by the defendants was reasonable.

In both causes of action, plaintiffs' contentions on the facts proved would require a major shift in constitutional duties from negatives to affirmatives. Thus the plaintiffs assert a governmental duty to set election dates so as to maximize voter participation and a similar duty as to notice of elections. While as a principle these goals can hardly be deprecated, they have not yet been raised to the constitutional level. Analogously, state legislative bodies are not required by the Constitution to search out and remedy all conditions which might be thought to be capable of improvement. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." Railway Express Agency v. New York, 1949, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533. Cf. North Dakota State Board of Pharmacy v. Snyder's Drug Stores, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). Here the question was the participation of recently enfranchised students. The selectmen conducted several student voter registration drives. They attempted to modify the election calendar for 1973 to facilitate student voting, but mainly because of the late date at which that modification was urged upon them, they were unable to surmount the problems which a change in the calendar would have entailed. They have now, however, by their adoption of the 1974 election calendar and their resolution of January 17, 1974, carried out their intent to modify the election calendar to facilitate student voting.

At the close of the trial it became obvious that there were no members of the class of students allegedly injured who were named as plaintiffs in this suit. Plaintiff Sherman remained on campus in a University dormitory during January. He therefore cannot claim that the selectmen's choice of an election date injured him in any way. Plaintiff Glusco apparently abandoned participation in the suit. Moreover, her residence was not in a school facility and therefore whether or not the University was in session would not affect her participation in the January election. Finally, since she did not live in University housing it is doubtful whether she was under 21; if not, she could not represent the class of students allegedly harmed. But for the presence of plaintiff Walgren there would be no doubt that we would have to dismiss the complaint for lack of a named class member. O'Shea v. Littleton, *supra*; Indiana Employment Division v. Burney, 1973, 409

U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62; Bailey v. Patterson, 1962, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512. Because of our view on the merits, however, we need not decide the question of plaintiff Walgren's standing [10] to raise the rights of student voters under 21 years of age.

It is ordered that judgment be entered for the defendants.

---

10. If all 142 students who were shown to have voted in the final town election, held when all students were in town, had voted for Mr. Walgren in the caucus, he would have still not qualified to run in the final election (Walgren trailed Schuerer in the caucus by 196 votes). Thus it is questionable whether Mr. Walgren could establish the *bona fide* injury in fact which is necessary to raise the rights of the students under Sierra Club v. Morton, 1972, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, and Eisenstadt v. Baird, 1972, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349.