Eric WALGREN et al.,
Plaintiffs-Appellants,

v.

BOARD OF SELECTMEN OF the
TOWN OF AMHERST,
Defendants-Appellees.

No. 74–1123.

United States Court of Appeals,
First Circuit.

Argued June 2, 1975.

Decided Aug. 8, 1975.

Eric Walgren, pro se.

David M. Roseman, Boston, Mass., with whom Tyler & Reynolds & Craig, Boston, Mass., was on brief, for defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This class suit, on behalf of both the entire college community and particularly college students in the 18 to 20 year age group, was brought against the selectmen of the college town of Amherst, Massachusetts, to invalidate the town election of 1973.[1]   The principal

1. The named plaintiffs were two students, Sherman and Glusco, and Walgren, not a student but a thirty-two year old activist and candidate for the office of selectman. The district court noted that the two students were not affected by defendants' actions and therefore could not represent the class allegedly harmed.

The court did not pass on the issue of Walgren's standing, in light of its view of the merits. We have in the past indicated that a candidate has standing to raise the constitutional rights of voters. *Mancuso v. Taft,* 476 F.2d 187, 190 (1 Cir., 1973).

question is whether the selectmen, in holding the town caucus during winter recess when many of the student voters were absent, violated the Twenty-Sixth Amendment or the equal protection clause of the Fourteenth Amendment. Initially, the district court granted summary judgment to defendants and dismissed the complaint for failure to state a cause of action. On appeal we vacated this order and remanded the case for trial on the merits. *Walgren v. Howes,* 482 F.2d 95 (1 Cir., 1973). Subsequently, the court held an extensive trial and issued its opinion, finding for defendants. *Walgren v. Board of Selectmen,* 373 F.Supp. 624 (D.Mass.1974). This appeal followed.

The controversy arises from events which took place over a ten-day period in December, 1972, during which the town selectmen, at plaintiff Walgren's urging, endeavored to change the scheduled date for the town caucus, the primary election in which nominees for the positions of town officer and town meeting member are selected. On December 10, 1972, Walgren protested the then recently-published schedule for the 1973 elections on the ground that the caucus date of January 19 would be during the winter recess of the University of Massachusetts, when some 10,000 dormitory students would be out of town.[2] On December 11 the board voted to reconsider the schedule of its December 18 meeting. After a week of public reaction, both pro and con, a long and animated meeting was held on December 18, at the end of which the board voted to establish a new calendar. But the dates for the caucus and the final election proposed by Walgren, January 29 and March 1, raised the possibility of a conflict with a state requirement that 31 days separate the two

dates. The board, being of the opinion that statutory notice for the proposed new dates would have to be published by the following day, provisionally adopted them, subject to advice of counsel. When, on December 19, the advice was received that the dates would be illegal, the board, at a special meeting in the evening, turned down its counsel's proposal that the town meeting itself be moved ahead by a week, and reinstated the original calendar.[3]

In addition to the chronology of events above recited, and a description of the demography of the town, referred to in n. 2, *supra,* the court in its findings noted that the University and the two colleges were not completely closed to students during the January recess period, there being some special studies programs and dormitory occupancy being permitted on request; that perhaps 1,000 University dormitory residents who were registered voters in the 18–20 year old age group were away from school on the January 19, 1973 caucus date; that 90 percent of the 1,587 registered student voters living in dormitories had homes in Massachusetts; and that "[b]efore, during and after the election in question, the defendant selectmen acted in good faith toward Mr. Walgren individually and student voters generally." 373 F.Supp. at 628. Moreover, the court noted that in 1974, the year following that in issue here, the selectmen chose a date agreeable to Walgren and the student government groups of the three schools. The selectmen are now on record, in a statement adopted while the trial was in progress, as endorsing a policy "to hold municipal elections on dates that afford all registered voters an opportunity to personally participate therein by casting

---

2. The town of Amherst has a non-student population of 15,000–16,000. Its student population, attending the University, Amherst College, and Hampshire College, is over 24,000. Of the town's 11,400 registered voters, approximately 3,000 were students, of whom 1,587 lived in University of Massachusetts dormitories. Most of the latter were in the 18–20 year age group.

3. Walgren became a candidate for selectman, receiving 217 votes. The present incumbent, Howes, received 1,353 votes, and a University graduate student, Schuerer, received 413 votes. Only 27 University dormitory students voted in the caucus, 26 in person and 1 by absentee ballot.

ballots at the polls." 373 F.Supp. at 628.[4]

The court first addressed plaintiff's equal protection argument, made on behalf of a class consisting of students, faculty, and staffs of the three colleges. It followed the analysis in *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), inquiring whether the burden was so severe as to be "unconstitutionally onerous" and if the date selected was arbitrary or tied to a legitimate purpose. With reference to the burden on student voting, the court noted that students had the options of staying on campus, returning to campus (many students' homes being within an hour's drive), or of casting an absentee ballot. It concluded that many students could have voted in person without much expense or inconvenience and that the use of absentee ballots posed no greater difficulties to students than to other voters, such as businessmen, servicemen and shut-ins. It also held that the date finally set was connected with a valid goal, citing the desirability of having a town meeting as soon in the fiscal year (then the calendar year) as the completion of the prior year's record made possible; the fact that a number of town meeting members, relying on the customary second Monday of March, had told various defendants that they had planned to be away thereafter; and the reluctance of the selectmen to add to voter and candidate confusion by adopting a set of dates differing from the original ones, those proposed by Walgren, and those proposed by the town's legal counsel.

■ On appeal plaintiffs do not press their equal protection claim, preferring to "treat the student franchise controversy as a 26th Amendment case." It is, however, not clear that they waive this claim. In any event, we agree with the

district court's conclusion. The burden on faculty, staff and students in this case would seem to be less than that of the eight to eleven month early enrollment requirements upheld in *Rosario.* It is true that the connection between the caucus date and legitimate town goals is more tenuous and less particularized than that in *Rosario.* As plaintiffs point out in their brief, fiscal uncertainty would not have been greatly affected by another week's delay before town meeting. The departure plans of several out of many town meeting members, three months in advance, would not seem to pose a serious problem.[5] And whatever confusion might have been generated by an additional set of dates could conceivably be removed over the course of future weeks and months.

Whatever doubts we might have on this score are resolved, not only by the lower standard of relationship between requirement and interest applied in *Rosario,* but also by the fact that defendants could reasonably think a decision as to the election schedule was compelled within a very short time. Their good faith judgment as to the sufficiency of town interests served and the adequacy of alternative dates cannot fairly be reviewed without taking into account the atmosphere of confusion and pressures of time in which they acted.

■ We proceed, then, to plaintiff's Twenty-sixth Amendment claim. In our prior opinion we acknowledged that even in cases arising under the Fifteenth Amendment analysis had not always been explicit, and that no clear test had yet emerged to determine when the Twenty-sixth Amendment is violated by governmental action bearing disproportionately on those enfranchised by that amendment. In the absence of evidence, briefs, and argument we left resolution of the issue in the first instance to the

---

4. These facts do not render this case moot, even apart from the possibility of recurrence of the issue, for defendant Howes, the victor in the 1973 election, is still serving his three-year term as a selectman.

5. How large a problem this was, we do not know. The testimony was to the effect that several selectmen, over a short period of time, had received calls from several town meeting members.

district court. We did, however, opine that

"it seems only sensible that if a condition, not insignificant, disproportionately affects the voting·rights of citizens specially protected by a constitutional amendment, the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective." 482 F.2d at 102 [footnote omitted].

The district court expressed its opinion that, absent the imposition of such a "gross burden" as would effectively deny access to the franchise, the Twenty-sixth Amendment does not add to the protection afforded by the Fourteenth Amendment. It relied both on what it termed the more fundamental value perception and deeper historical background leading to the Fifteenth Amendment and on what we might call the underinclusiveness of a Twenty-sixth Amendment approach to problems created by imposing burdens on the exercise of franchise by all students, a substantial number of whom are over 21 years of age. The court nonetheless proceeded to apply our formula. It first found the burdens already discussed in its equal protection analysis "insignificant in a constitutional sense," 373 F.Supp. at 634. It then addressed the issue of disproportionality. As contrasted with the 1,000 registered student voters in the 18 to 20 age group, who had been found to be burdened, the court had no evidence from which to conclude how many registered voters in the same age group were not inconvenienced by the caucus date, nor any basis for estimating the percentage of the burdened among Amherst voters 21 years of age and over. It concluded that any effort to arrive at a comparison of ratios would be speculative. So finding, it did not explore the means by which the compelling interest of the town might be served in a less drastic way.

While we now have the benefit of the evidence, oral and written argument, and the district court's opinion, we are still without the assistance of any precedents guiding us in evaluating the impact of the Twenty-sixth Amendment. It is difficult to believe that it contributes no added protection to that already offered by the Fourteenth Amendment,[6] particularly if a significant burden were found to have been intentionally imposed solely or with marked disproportion on the exercise of the franchise by the benefactors of that amendment. But we need not now face this issue, for, under the circumstances of this case, we join the district court in its conclusion that even under a rigorous standard of review the Amherst town election of 1973 should be upheld.

In so holding, we pursue a somewhat different course than did the district court. We do not reject its conclusion as to the speculativeness of determining whether 18–20 year old voters were disproportionately burdened, assuming the existence of a significant burden. That is a decision we think the court was entitled to make on this record. While this could end our analysis, we are disinclined in a case raising important issues to rest our decision on the technical point of burden of proof. As for the court's holding that the burdens themselves—of returning during recess to vote in person or of going through the application and notarial execution process of absentee voting—are insignificant, we are uncomfortable. We would not wish the end result of this lengthy litigation to be construed as authority for setting critical

---

**6.** Our case differs in one important particular from *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), relied on in part by the district court for its views concerning the strength of the Twenty-sixth Amendment, 373 F.Supp. at 635 n. 9. In that case the Court in assessing the importance to be accorded education (for the purpose of determining the standard of judicial review), stated that "the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution." 411 U.S. at 33–34, 93 S.Ct. at 1297. Here the right in question arises from a specific amendment to the Constitution.

election dates during college recesses in communities having a very large if not majority proportion of students who are also eligible voters in the 18–20 year age group, without a showing of some substantial justification. In short, we would be disturbed if, given time to explore alternatives and given alternatives which would satisfy all reasonable town objectives, a town continued to insist on elections during vacations or recess, secure in the conviction that returning to town and absentee voting would be considered insignificant burdens.

The critical element which in our view serves to sustain the 1973 election is the foreshortened time frame within which the selectmen were forced to face up to and resolve a problem which was then novel. As the district court observed, "They attempted to modify the election calendar for 1973 to facilitate student voting, but mainly because of the late date at which that modification was urged upon them, they were unable to surmount the problems." 373 F.Supp. at 636. While we noted in our earlier opinion that the "presence or absence of intent to discriminate against the protected class [does not] seem relevant in many circumstances," 482 F.2d at 101 n. 14, the finding that defendants acted in good faith in a crisis atmosphere is significant.[7] We say here what we said in a different context in *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 962 (1 Cir., 1972), "Were we to adjudicate this as a restriction for all time, . . . we might well come to a different conclusion."

We would add that, under the circumstances of this case, even if we had found the burden impermissible, we would have looked upon the novelty and complexity of the issue, the shortness of

time, and the good faith efforts of the defendants as sufficient justification for refusing to order a new election at this late date. *Allen v. State Board of Elections,* 393 U.S. 544, 571–72, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). *See also Developments in the Law—Elections,* 88 Harv.L. Rev. 1111, 1334–1339 (1975).

The district court's analysis of plaintiffs' challenge to the notice of the election given by the town seems to us entirely proper, as was its discretionary dismissal of a pendent state cause of action.

*Affirmed.*

7. We are well aware that plaintiffs dispute the finding of good faith, but conclude that there is ample evidence to support it. While it might be thought that proposing a new election schedule which would conform to the spacing requirements of the state statutory scheme, meet the general timing requirements of the town, and accommodate most of the university and college students would not be inordinately difficult, one has only to read the record to see how people acting in good faith under pressure can generate chaos from simplicity. Orderly resolution was not assisted by the apparent fact that the lawyer called upon by the town for a legal opinion as to a proposed schedule miscopied a key date in his notes, or by the apparently erroneous impression of defendants that the schedule had to be published by December 19.